Ira C. RITTER and The Kroger Co.,
Appellants–Defendants,

v.

Jerry STANTON and Ruth A. Stanton,
Appellees–Plaintiffs.

No. 49A02–9912–CV–883.

Court of Appeals of Indiana.

March 14, 2001.

Karl L. Mulvaney, David C. Campbell, Nana Quay–Smith, Candace L. Sage, Bingham Summers Welsh & Spilman LLP, Julia Blackwell Gelinas, Kevin C. Schiferl, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellants.

Thomas E. Hamer, Anderson, IN, David V. Dorris, Dorris Law Firm, P.C., Bloomington, IN, Patricia A. Small, William L. Broom, III, Barrett, Twomey, Broom, Hughes & Wesley, Carbondale, IL, Attorneys for Appellees.

## OPINION

BARNES, Judge.

### Case Summary

This case stems from a personal injury action brought against Ira Ritter and the Kroger Company ("Kroger") as a result of an accident occurring on Kroger property while the Plaintiff, Jerry Stanton, was working as a truck driver for a Kroger subsidiary. The jury awarded $55,000,000 in compensatory damages after determining that Stanton was 20% at fault. We affirm.

### Issues

Kroger raises two primary issues for our review, namely:

I. whether the trial court erroneously denied its motion to dismiss for lack of subject matter jurisdiction because of the exclusivity provision of the Indiana Worker's Compensation Act ("Act"); and

II. whether the jury awarded excessive damages.

### Facts

Forty-eight year-old Stanton was a truck driver for Gateway Freightline Corporation ("Gateway"), a wholly owned subsidiary of Kroger. On May 6, 1995, he traveled from his home state of Illinois to Indianapolis for the purpose of returning empty milk containers to Kroger's dairy. Prior to leaving Kroger's Indianapolis Distribution Center, he stopped for a break and parked his tractor-trailer beside a parked trailer. In the meantime, Ritter, a Kroger employee, began backing a Kroger tractor toward the same parked trailer. Unaware that Ritter was moving toward him, Stanton walked between Ritter's backing tractor and the parked trailer. After Stanton stopped momentarily, he was pinned between the parked trailer and Ritter's tractor, suffering massive injuries.

Stanton and his wife, Alfie, filed suit in June 1995 against Ritter and Kroger, alleging negligence resulting in permanent injuries to Stanton and loss of consortium to his wife. Two years later, Kroger filed a motion to dismiss for lack of subject-matter jurisdiction on the basis that the claims were barred by the exclusivity provision of the Act because Stanton was em-

ployed by a Kroger subsidiary. The following year, the trial court denied the motion and refused Kroger's request for interlocutory appeal.

The case was tried to a jury for several weeks in mid 1999. At trial, the parties stipulated that Stanton suffered $1,281,741 in special damages, including past medical expenses, lost earnings, and lost future pension benefits. Kroger defended the suit on the basis that Stanton's claim was barred because he was totally at fault for the accident. During his closing argument, Stanton suggested the following damage amounts: $2 million for future medical expenses; $3 million for past disfigurement; $10 million for future disfigurement; $7 million for past pain and suffering/ability to function as a whole person; $30 million for future pain and suffering; $2 million for past loss of consortium; and $10 million for future loss of consortium. Including the $1,281,741 in special damages, Stanton requested a total verdict of $65,281,741. After deliberating for a relatively short time, the jury returned a verdict in favor of the Stantons for $55,000,000, which reflected a 20% reduction or discount for Stanton's comparative fault.

## Analysis

### I. Exclusivity of Worker's Compensation Remedy

The threshold issue this case presents is whether the exclusivity provision of the Act bars Stanton's claim. This provision of the Act provides:

> [T]he rights and remedies granted an employee[1] subject to I.C. 22-3-2 through I.C. 22-3-6 on account of personal injury or death by accident shall

exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death....

Ind.Code § 22-3-2-6. The only way for an employee to recover for personal injuries arising out of and in the course of employment is through worker's compensation. Kroger claims that Kroger and Gateway are the same "employer" for purposes of the exclusivity provision, and, therefore, that Stanton's sole remedy is through worker's compensation.

### A. Standard of Review

 The appropriate standard of review is disputed by the parties with respect to the question of jurisdiction. Kroger filed a motion to dismiss for lack of subject-matter jurisdiction pursuant to Indiana Trial Rule 12(B)(1). In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the trial court may resolve factual disputes. *Perry v. Stitzer Buick GMC,* 637 N.E.2d 1282, 1286–87 (Ind.1994); *Common Council v. Matonovich,* 691 N.E.2d 1326, 1328 (Ind.Ct.App. 1998), *trans. denied.* In doing so it may consider not only the complaint and motion to dismiss but any affidavits or other evidence submitted. *Id.* Moreover, a court may weigh the evidence to determine the existence of the requisite jurisdictional facts. *Id.* It is well-settled that when the facts are *not* in dispute, we review a ruling on a motion to dismiss de novo. *See, e.g., Common Council,* 691 N.E.2d at 1328; *Rieheman v. Cornerstone Seeds, Inc.,* 671 N.E.2d 489, 491 (Ind.Ct.App.1996), *trans. denied.*

---

**1.** Indiana Code Section 22-3-6-1(b) defines an "employee" under the Act as "every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation or profession of the employer."

■ When the facts related to subject-matter jurisdiction are in dispute, the proper standard of review is not as clear. Some cases have said that "when we review a trial court's ruling on [a motion to dismiss for lack of subject-matter jurisdiction], we may affirm the judgment on any theory supported by the evidence of record." *Vranicar v. Board of Comm'rs of Brown County*, 730 N.E.2d 752, 755 (Ind. Ct.App.2000); *M.V. v. Charter Terre Haute Behavioral Health System, Inc.*, 712 N.E.2d 1064, 1066 (Ind.Ct.App.1999). Additionally, when in ruling on such a motion the trial court considers evidence outside the complaint (affidavits, etc.), holds a hearing during which the parties present arguments regarding the evidence, *and* issues findings of fact and conclusions thereon, an appellate court will review the trial court's resolution of the factual disputes by applying a clearly erroneous standard. *Lawson v. Raney Mfg.*, 678 N.E.2d 122, 126 (Ind.Ct.App.1997), *trans. denied.*

We have stated that the question of whether an injury occurred in the course of employment depends upon the facts and circumstances of each case. *Northcutt v. Smith*, 642 N.E.2d 254 (Ind.Ct.App.1994). In that case, we reasoned:

> [a]lthough the Northcutts concede that Northcutt's injury arose in the course of his employment and the facts are not in dispute regarding how, where, and when the injury occurred, the question of whether Smith is subject to liability pursuant to the Act remains *a mixed question of law and fact*, which ultimately will determine whether the trial court has jurisdiction over the subject matter.

*Id.* at 256 (emphasis added). We concluded that the review of such a factual determination was for an abuse of discretion. *Id.*

■ Despite the semantic differences among these cases in articulating the standard of review, the overarching principle is clear: when the trial court resolves factual issues in reaching its decision on subject-matter jurisdiction, deference should be afforded on appeal just as in any other type of case where the trial court weighs the facts. The standard of review for the jurisdiction determination in this case then turns on the question of whether there were any questions of fact before the trial court in ruling on the motion to dismiss. The parties may not dispute the facts surrounding the accident, but they do dispute some of the facts and many of the inferences to be drawn therefrom relating to the relationships between Kroger and Gateway and between Kroger and Stanton. The trial court necessarily made factual determinations in reaching its conclusion that Stanton's claim was not barred by the Act, even though it did not issue written findings detailing those specific determinations. Therefore, we will give deference to the trial court's decision when reviewing this issue. We now turn to the substance of the arguments.

### B. McQuade v. Draw Tite, Inc.

The thrust of Kroger's jurisdictional argument is that Kroger and Gateway were the same employer at the time of the accident and, as a result, Stanton is prohibited from suing Kroger. In effect, Kroger is asking us to permit it to defensively "pierce the corporate veil" erected when it formed its parent-subsidiary corporate structure and find that it was actually the employer of Stanton by virtue of the fact that it is Gateway's parent company.

The watershed case addressing this issue is *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016 (Ind.1995). In that case, an injured employee brought a negligence action against her employer's parent corporation for injuries sustained in the course of employment. The trial court held that

the parent company was so interconnected with the subsidiary that it was equivalent to the plaintiff's "employer" under the Act and, therefore, that the plaintiff could not pursue the cause of action because the exclusive remedy for her injuries against her "employer" was under the Act. *McQuade,* 659 N.E.2d at 1017.

Our supreme court reversed the trial court and this court, rejecting our conclusion that because the parent company oversaw and controlled the subsidiary's operations, reported the subsidiary's earnings as profits, shared a worker's compensation policy with the subsidiary, and performed payroll and accounting functions for the subsidiary, the parent and subsidiary corporations were not distinct and separately operated corporations. *Id.* at 1020. The supreme court held as a case of first impression that the exclusivity provision of the Act did not prevent an employee of a subsidiary from suing a parent corporation for injuries sustained in the course of employment. *Id.* The supreme court recognized a subsidiary and its parent corporation as separate legal entities and acknowledged that a court may exercise its equitable power in disregarding the corporate form. *Id.* However, the supreme court emphatically concluded "there is little

likelihood that equity will *ever* require us to pierce the corporate veil to protect the same party who erected it." *Id.* (emphasis added). Because corporate parents are not covered under the language of the exclusivity clause, and any uncertainty as to the clause's applicability calls for a narrow construction of the statute in favor of the employee, the supreme court found no statutory basis for the trial court's grant of summary judgment in favor of the corporate parent. *Id.*

In so holding, the court cited the "well reasoned analysis" of the Sixth Circuit, which had adopted the most widely accepted approach and stated:

> [A] business enterprise has a range of choice in controlling its own corporate structure. But reciprocal obligations arise as a result of the choice it makes. The owners may take advantage of the benefits of dividing the business into separate corporate parts, but principles of reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee.

*Id.* at 1019 (quoting *Boggs v. Blue Diamond Coal Co.,* 590 F.2d 655, 661–62 (6th Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979)).[2] Our su-

---

**2.** Similar policy concerns were raised by Judge Kirsch in his dissenting opinion in *Nowicki v. Cannon Steel Erection Co.,* 711 N.E.2d 536 (Ind.Ct.App.1999), *trans. denied.* In that case, the court affirmed the trial court's findings that a crane operator was an employee of a construction company and that his claim was therefore barred by the Act's exclusivity provision. *Id.* at 544. Judge Kirsch detailed serious policy concerns implicated by the conclusion that the worker's claim was barred. He wrote in part:

> [M]y dissent is based on public policy concerns and what I believe to be a misapplication of such concerns by our courts. In its opinion, the majority iterates the oft-re-

peated statement that 'public policy favors the inclusion of employees within the scope of the Worker's Compensation Act' ... The purpose underlying this policy was to insure that workers injured in workplace accidents in the course of their employment would receive the health and disability benefits mandated by the act. The purpose was not to immunize third-party tort feasors and their liability insurers from liability for negligence which results in serious injuries to one who is not in their employ. And yet, that is the result of the application of the foregoing policy to cases such as the one now before us.

> It is from the application of this policy that the burden shifted to the injured em-

preme court reiterated that "it was, after all, [the] defendant who chose to structure itself in its present multi-corporate form." *Id.* at 1020. The supreme court clarified its holding by stating, "[w]hat our decision is meant to prevent is a situation where an injured party would be deprived of his or her day in court by the purely fortuitous circumstance that the alleged tortfeasor is the corporate parent of the injured party's employer." *Id.* at 1020 n. 7.

On its face, Kroger's entreaty to pierce its corporate veil defensively by claiming Stanton cannot sue the parent corporation of his employer clearly fails in light of the express holding by the *McQuade* court rejecting such an attempt. Nonetheless, Kroger contends that *McQuade* is distinguishable because the relationship between it and Gateway is more interconnected than the relationship between the parent and subsidiary corporations in that case. Our review of the record leads us to conclude that although there is undoubtedly some degree of interconnectedness between Kroger and Gateway, we see no legal compulsion to depart from the *McQuade* holding.

Kroger and Gateway had a contract governing the terms for the services Gateway provided to Kroger. It contains several clauses contradicting Kroger's assertion that it considered Gateway to be the same entity and/or that it perceived Gateway drivers to be its own direct employees. The contract identifies the companies as separate entities and states that Gateway was "engaged in the business of warehousing and distributing dry groceries, health and beauty aids, dairy perishables and pro-duce (product), meat, frozen food and fresh dairy products" and that Kroger "desires to utilize the facilities and services of [Gateway]." Record p. 932. The contract provides that Gateway is a "bailee only" and that title to all product delivered for Kroger shall remain in Kroger. *Id.* Significantly, the contract contains mutual clauses whereby each company agreed to hold the other harmless and indemnify the other from all claims, suits, and judgments for damages caused by the act or omission of its agent or employee. Also, Gateway was required to furnish Kroger with a certificate evidencing coverage under Illinois' worker's compensation laws. Kroger is required to pay Gateway for each case of product it delivered and for transportation charges according to the published tariff. Attached to the contract are several exhibits detailing various aspects of the work to be performed by Gateway. One of the exhibits indicates that Gateway would deliver store mail to Kroger stores for a per-delivery fee. Another exhibit concerns baled salvage and provides that Gateway would charge Kroger a fee per bale for handling it. The exhibit also states that a buyer should direct checks for the bales to Gateway and that Gateway would send checks to Kroger for its portion. These contract provisions are not the type one would typically expect Kroger to have in an agreement with its own employees.

There are other indicia of the nature of the relationship between Kroger and Gateway. First, the hiring of anyone below the top management of Gateway was left to Gateway employees. The employment ap-

---

ployee to prove that the claim falls outside the coverage of the act. . . .

\* \* \* \* \*

If it is the public policy of this state to allow third-party tort feasors and their liability insurers to use the Indiana Worker's Compensation Act as a shield by which to immunize themselves from liability for their wrongful acts resulting in serious injuries to the employee of another, then it is a policy which should be re-examined. I would not apply the policy in this way. . . .

*Id.* at 544–45 (citations omitted).

plication completed by Stanton was labeled as that of Gateway. After the accident, Gateway filed the First Report of Injury or Illness as the employer without referencing Kroger. Kroger maintains that it had at least indirect authority to discipline Gateway drivers. It states that if "a Kroger store manager had a problem with a particular Gateway driver, the manager would call Paul Upton, Gateway's Vice President and General Manager, to complain." Appellant's Brief p. 20. In addition, Kroger claims that "[c]ommon sense dictates that Kroger had the right and power to compel the discharge of a Gateway driver...." Appellant's Brief p. 20. Stanton responds that Kroger did not have authority to terminate a Gateway driver due to the local addendum to the union contract with Gateway's drivers pursuant to which only Gateway could terminate them. Kroger's Manager of Safety and Health testified that to the best of his knowledge, no Gateway Teamster driver was ever suspended by anyone other than an employee of Gateway. He also stated that if a Kroger store manager had a problem with a particular Gateway driver, the manager would call Gateway's Vice President to complain but that Gateway disciplined the driver if it was deemed necessary. Kroger's Transportation Manager testified that she cannot suspend or fire a Gateway driver because "it's a different contract and they have a boss." Record p. 1510. Gateway's Vice President and General Manager testified that even at the store level, Kroger employees would not suspend a Gateway driver.

Kroger contends that the fact that it "may not have had the absolute authority to directly terminate Gateway employees" does not mean that it could not compel such termination. Appellant's Reply Brief p. 14. However, the ability to complain about a driver is not the same thing as the authority to discipline the driver. Any customer has the ability to complain about a driver but not the authority to directly discipline that driver. It is clear from this evidence that although Kroger may have had some influence over such decisions, Gateway ultimately controlled the hiring and discipline of its drivers.

Second, the parties agree that Kroger provides the capital that funds Gateway's operating budget because Gateway is operated under a zero-based budget. That is to say, on a daily basis, all cash in excess of Gateway's operating needs is wire-transferred for deposit into Kroger's operations account for investment. Likewise, if Gateway's operating costs exceed its available cash revenues, necessary funds are wire-transferred to Gateway. However, it is reasonable to conclude from our review of the record that at least a portion of Gateway's gross receipts were returned to Gateway to fund its own payroll. The employer participation portion of Stanton's health insurance was paid under Gateway's accounting system, and Gateway reimbursed Kroger for its portion of the worker's compensation premium.

Third, Kroger supplied Gateway with tractors and trailers to which Gateway decals were affixed. However, the tractors and trailers operated by Gateway and bearing Gateway's logo are titled in the State of Illinois in the name of Gateway. Stanton testified that Kroger tractors were not driven unless a Gateway unit had broken down because the tractor is a piece of equipment authorized to run as a contract carrier for hire such that it had to be licensed to Gateway. The executive secretary to Gateway's vice-president testified that some of the trailers pulled by Gateway drivers may carry a Kroger logo because a company with common carrier authority can pull another company's trailers with its own power units. In addition, if Kroger employees worked on a Gateway

truck, Kroger billed Gateway (at least as "paper charges") for labor time of the Kroger employee and for any parts used. Record pp. 1318–19, 1354.

Fourth, Kroger sometimes supplied Gateway drivers with keys to the Kroger stores to which they made deliveries to facilitate evening or after-hours deliveries. However, when keys to Kroger stores were given to Gateway drivers, they were given by somebody within Gateway rather than Kroger. Furthermore, the facilities have a driver's door because the drivers would drop or unload a mail bag, a service for which Kroger paid Gateway.

Finally, the Kroger distribution manager, together with the manager of logistics, created delivery schedules and determined when groceries were to be delivered to Kroger stores. While at the distribution center, Gateway drivers were directed by Kroger managers.[3] Kroger provided directions as to which stores a driver was to make deliveries. However, Gateway drivers received supervision and instructions from Gateway supervisory personnel. Kroger's logistical planning was for its own benefit and was the same as any other customer of a trucking company that would need to coordinate deliveries. Gateway billed Kroger for any freight hauling it did for Kroger.

From this and other evidence in the record, we conclude that although there is a certain degree of interconnectedness between the companies, there is a deliberate attempt to keep a significant portion of the businesses separate. Kroger may oversee Gateway's operations, report Gateway's earnings, share a worker's compensation policy with Gateway, and perform some accounting functions for Gateway, but those were the exact characteristics of interconnectedness rejected by the *McQuade* court. Therefore, the policy concerns articulated by the *McQuade* court are implicated here. If Kroger intends to maintain separate corporate entities for tax or other purposes, then it should not be permitted to disregard that corporate form when it is convenient for it to do so to avoid potential liability. Equity requires us to reject Kroger's attempt to pierce its veil because this is the precise situation the *McQuade* court intended to prevent.

### C. Exception to the McQuade Holding

To circumvent this result, Kroger claims that the circumstances present in this case fall within an "exception" to the *McQuade* prohibition. In the text of the opinion, the *McQuade* court stated:

> Plaintiff contends that the Court of Appeals' decision is erroneous because Indiana courts disregard the corporate form only when it has been used to promote fraud or some other injustice, and therefore, the Court of Appeals should not have permitted defendant's 'defensive piercing of the corporate veil.' Defendant contends that the Court of Appeals properly applied a 'reverse piercing' of the corporate veil doctrine in determining that plaintiff's claim is barred.

*Id.* at 1019. A footnote immediately followed, stating that "Defendant does not claim that it had an express or implied employment contract with Plaintiff. Rather, its claim is based solely upon its interconnectedness with Mongo." *Id.* at 1020 n. 4. Kroger argues the footnote "left open

---

**3.** It is to be expected that Kroger would control the traffic movement on its property and the use of its facilities by its own employees, as well as those of Gateway and other trucking companies. The mere conformity with rules made for the general policing of the premises, when there are a number of separate groups of workers on the premises, does not mean that all of those workers are thus transformed into Kroger employees.

the question" whether under certain circumstances, piercing the veil to find that the parent corporation is the employer of the plaintiff could be appropriate. Kroger contends the footnote creates an exception where an implied or express employment contract is present. Kroger alleges that there was an express contract of employment between Kroger and Stanton by virtue of a collective bargaining agreement and Kroger's 401(k) plan.

■ Kroger's argument presupposes the existence of an "exception" to the *McQuade* holding in situations where there is a contract of employment. It is far from clear that the language and context of the footnote creates such an automatic exception. Rather, Kroger asks us to read an intent into the footnote where we find none. As the *McQuade* court set out the parties' arguments, it mentioned that the defendant had not claimed the existence of a contractual relationship. That could mean the analysis contained in the opinion might have been different had there been an allegation of a contractual relationship; it could also merely be a reminder that it would not specifically address the issue of an employment contract because the issue was not before it. We see no indication from the passing reference in the footnote that our supreme court intended to articulate a blanket or automatic exception to its clear holding for cases where an employment contract is involved. In those cases, it seems appropriate to evaluate a particular contractual relationship carefully to determine whether it is sufficient to fall outside the scope of the general *McQuade* holding preventing parent corporations from seeking protection from liability by piercing their own corporate veils. Although in other cases such contractual relationships may exist to create an exception to the *McQuade* holding, we see no intent by our supreme court to create a broad exception to its holding.

This is particularly true in light of the definitive language in the opinion clearly rejecting defensive corporate veil-piercing based on public policy concerns.

■ Even if we were to indulge Kroger's claim that there is some sort of exception created by the footnote language in *McQuade*, we do not find a sufficient contractual relationship between Kroger and Stanton to fall within it. The thrust of Kroger's argument is that the collective bargaining agreement governing Stanton's employment with Gateway was a contract of employment with Kroger and created an "express contractual employment relationship" between Kroger and Stanton. Appellant's Reply Brief p. 8.

From August 1989 through August 1994, a labor agreement was in effect that had been negotiated by Stanton's union, Teamsters Local 627, with Gateway. Upon the expiration of that agreement, Local 627 chose not to continue operating under a separate agreement with Gateway and instead decided to associate Gateway members with other workers to obtain more favorable contract terms. It decided to become a part of the Kroger and Teamsters "Master Contract" that had been negotiated between Kroger and the International Teamsters Union. In so doing, Gateway accepted the same contract for its union drivers as was negotiated for Kroger union drivers with certain conditions as outlined in a letter from Local 627. The Master Contract identified "The Kroger Co." as the "Employer" and referred to the Teamsters Kroger National Negotiating Committee representing Local Unions affiliated with the International Brotherhood of Teamsters and Local Union as "Union." The Master Contract was not signed by any Gateway officer, but was ratified locally.

Kroger maintains that this collective bargaining agreement created an express employment contract between Kroger and Stanton. This court has stated:

The general rule is that, in order to be found valid and enforceable, an employment contract must contain four terms: 1) it must state the place of employment; 2) it must state the period of employment; 3) it must state the nature of the services the employee is to render; and 4) it must state the compensation the employee was to receive.

*Majd Pour v. Basic American Medical, Inc.,* 512 N.E.2d 435, 439 (Ind.Ct.App. 1987); *see also Jones v. General Elec. Co.,* 87 F.3d 209, 213 (7th Cir.1996), *cert. denied.* Kroger cites little authority for its declaration that the collective bargaining agreement constituted an employment contract under this or any other definition of such a term of art.

The primary authority Kroger does rely upon is *Bentz Metal Products Co. v. Stephans,* 657 N.E.2d 1245 (Ind.Ct.App.1995), which, according to Kroger, recognizes "an employee covered by collective bargaining agreement as party to an at-will employment contract with company." Appellant's Reply Brief p. 10. Our review of that case does not lead us to the same conclusion regarding its definitive statement on collective bargaining agreements. In *Bentz,* the court held that employment security provisions in a collective bargaining agreement did not necessarily conflict with the employment at-will doctrine and that the former employee was not barred from pursuing an action for retaliatory discharge by the fact he was covered by a collective bargaining agreement. *Bentz,* 657 N.E.2d at 1249–50. The court noted that the company had relied heavily on *Remington Freight Lines, Inc. v. Larkey,* 644 N.E.2d 931, 939–40 (Ind.Ct.App.1994), in which this court stated that it recognized "the distinction between employees who are retained for a definite duration or subject to contract, and employees whose employment is of indefinite duration, and may terminate at the will of the employer for any reason." However, the *Bentz* court then stated that "filing a grievance, the remedy available to [the employee] under the terms of the [Collective Bargaining] Agreement, is not the same as obtaining relief under a breach of contract action, which is the actionable claim of a wrongfully discharged employee under a contract for a definite term." *Id.* at 1249. This case holds that the existence of a collective bargaining agreement does not preclude the existence of an employment at-will relationship between the employer and the employee. It does not stand for the definitive proposition that a collective bargaining agreement *creates* an employment *contract.*

Other cases have found that a collective bargaining agreement is not an employment contract for certain purposes. For example, in *Peake v. International Harvester Co.,* 489 N.E.2d 102 (Ind.Ct.App. 1986), *trans. denied,* we held that a collective bargaining agreement between a former employee's union and his former employer was not a "written contract" within the statute-of-limitation exception for actions arising from employment agreements not in writing, and thus, the statute of limitation applied. We rejected the plaintiff's claim that the terms, conditions, and privileges of his employment were governed by the written collective bargaining agreement between his union, the U.A.W., and International Harvester on the basis that it was uncontested he was an hourly employee hired under an oral contract. *Id.* at 105.

In so holding, the court relied on *International Union, U.A.A. & A.I. Workers of America (UAW), AFL–CIO v. Hoosier*

*Cardinal Corp.*, 346 F.2d 242 (7th Cir. 1965), *aff'd.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192. In that case, the U.A.W. sought to recover vacation pay for the company's employees. Rejecting the union's argument that a twenty-year statute of limitation for actions on written contracts rather than Indiana's six-year statute regarding accounts and contracts not in writing applied to those facts, the Seventh Circuit determined:

> [p]laintiff's action in the district court was based upon the contract of employment between the individual employees and defendant. There is no evidence or contention that these employment contracts were ever reduced to writing. It was for wages due under these employment contracts that the present action was brought. . . .

*Id.* at 245. In affirming, the United States Supreme Court reasoned that "[p]roof of the breach and of the measure of damages, however, both depend upon proof of the existence and duration of separate employment contracts between the employer and each of the aggrieved employees." *Hoosier Cardinal*, 383 U.S. at 706, 86 S.Ct. at 1113. The Supreme Court held that although the provision concerning the company's payment of vacation pay to its employee-members was embodied within the provisions of the written collective bargaining agreement, the determination of which statute of limitation applied was to be determined by whether each employee's contract of hiring was oral or written.

Several federal courts have likewise concluded that a collective bargaining agreement does not create an employment contract. Most importantly, the U.S. Supreme Court has held:

> Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and

pay in that unit. *The result is not, however, a contract of employment except in rare cases;* no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment.

*J.I. Case Co. v. National Labor Rel. Bd.*, 321 U.S. 332, 334–35, 64 S.Ct. 576, 579, 88 L.Ed. 762 (1944) (emphasis added). In *Young v. North Drury Lane Productions, Inc.*, 80 F.3d 203 (7th Cir.1996), the Seventh Circuit noted that it could not find any cases where a collective bargaining agreement provided individual guarantees of employment to named employees and cited authority stating, "[A] labor agreement is not a contract of employment; employees are hired separately and individually, but the tenure and terms of their employment once in the unit are regulated by the provisions of the collective bargaining agreement." *Id.* at 206. Similarly, the Fifth Circuit has stated that "[u]nlike a contract of employment, ordinarily a collective bargaining agreement does not create an employer-employee relationship. . . . It neither obligates any employee to perform work nor requires the employer to provide work." *In re Continental Airlines Corp.*, 901 F.2d 1259, 1264 (5th Cir.1990), *cert. denied*, 506 U.S. 828, 113 S.Ct. 87, 121 L.Ed.2d 50.

■ Therefore, although collective bargaining agreements can be considered contracts relating to employment, they do not necessarily create a "contract of employment" within the strict meaning of the term. Any contractual relationship created between Kroger and Stanton by virtue of the Master Agreement is not the sort of "employment contract" that would be contemplated by the footnote in *McQuade*.

The holding and strong policy language of *McQuade* clearly reject a corporation's ability to pierce its veil to protect itself by asserting that it and its subsidiary are the same employer. It is evident from the unequivocal language of the opinion that any potential exception to that rule would have to be narrowly drawn and would occur only under very limited circumstances. The contractual relationship created by the fact that Stanton's local union combined forces with the larger Teamsters' organization to secure better benefits for Gateway employees is not the sort of relationship for which our supreme court would contemplate an exception. Rather, if any exception is suggested by the "express or implied employment contract" language of the footnote, it would be limited to cases where there is a direct employment contract with the parent corporation, not a collective bargaining agreement that includes the parent corporation along with other employers. To hold otherwise would circumvent the holding and compelling policy arguments articulated in *McQuade* because a parent corporation could avoid liability by piercing the corporate veil any time a collective bargaining agreement exists.

■ Kroger also contends that Stanton had a contractual relationship with it as a participant in the Kroger 401(k) plan ("K Plan"). The K Plan allows participation as follows:

*Participating Employers.* The participating employers of the Plan are referred to herein as 'Employers' and are defined as the Company and all of its subsidiaries and any other affiliated organization which is a member of the same controlled group of organizations under the Internal Revenue Code of 1986, as amended (the 'Code') as the Company, which is authorized by the Board of Directors of the Company ('Board') to adopt the Plan and which has adopted the Plan and Trust by the action of its own Board of Directors. Except as otherwise indicated, any references to 'Kroger' or 'the Company' relating to its role as an Employer under the Plan shall be deemed to include any other Employers.

Record p. 619. The parties contest the interpretation of this language. Kroger contends that Gateway had to be a member of the same "controlled group" as Kroger pursuant to the Internal Revenue Code, which provides that all employees of all corporations that are members of a controlled group of corporations shall be treated as employed by a single employer. Stanton, on the other hand, maintains that Gateway was a separate participating employer under the K Plan and, therefore, that his participation in the plan was not evidence that he was a Kroger employee. Stanton's position is more consistent with the plain language of the provision. The provision clearly identifies subsidiaries as "participating employers" and as separate and distinct entities from those other "affiliated organizations" that were required to be part of the "controlled group." Contrary to Kroger's argument, subsidiaries were not required to be part of the "controlled group." We cannot conclude that an employment contract was automatically created between Kroger and Stanton by the fact that Stanton contributed to the K Plan when the K Plan is designed to allow the participation of other employers, such as Kroger subsidiaries. Stanton did not automatically become a Kroger employee simply because his employer, Gateway, was one of several participating employers in the K Plan. Furthermore, even if some sort of contractual relationship existed between Kroger and Stanton by virtue of the K Plan, it is not the sort of direct employment contract that might warrant an exception to the *McQuade* holding.

Our supreme court has expressly prohibited the precise type of defensive veil-piercing Kroger is attempting to accomplish in this case. We find that the degree of interconnectedness between the companies is not sufficient to justify a defensive piercing here. Similarly, we find no blanket "exception" to the prohibition in the language of the footnote for employment contracts. Even if such an exception may exist under limited circumstances, we find that the collective bargaining agreement and the K Plan do not create a contractual relationship sufficient to bring this case outside the scope of the *McQuade* holding. Therefore, we conclude that the trial court properly denied Kroger's motion to dismiss because Stanton's claim is not barred by the exclusivity provision of the Act.[4]

## II. Damages

■■■ The second challenge raised by Kroger relates to the damage award. Although Kroger admits that Stanton was seriously and permanently injured, it maintains that the award is excessive and that we should either remit it or remand the case for a new trial on damages. Kroger contends that the verdict was motivated by passion, prejudice, or partiality and that the evidence does not support such a large award.[5]

■■■ Broadly stated, the person injured by the negligence of another is entitled to reasonable compensation. *Kav-*

anagh v. Butorac, 140 Ind.App. 139, 144, 221 N.E.2d 824, 828 (1966). Courts have said that term means such sum as would reasonably compensate the victim both for bodily injuries and for pain and suffering. *Id.* To that sum is added past, present, and future expenses reasonably necessary to the plaintiff's treatment and all financial losses suffered, or to be suffered, as a result of the inability to engage in his usual occupation. *Id.* "Compensation is the stated goal of a court when measuring damages for personal injuries." *Id.* (citation omitted). The question, as is so frequently raised in personal injury actions, is how much money reasonably compensates the Stantons for their injuries and pain and suffering.

### A. Standard of Review

■■■ This court applies a strict standard when reviewing a jury verdict containing a damage award claimed to be excessive or inadequate. *Dee v. Becker,* 636 N.E.2d 176, 177 (Ind.Ct.App.1994). On appeal, we will consider only the evidence that supports the award together with the reasonable inferences therefrom. If there is any evidence to support the amount of the award, even if it is conflicting, this court will not reverse.

■■■ Traditionally, the jury has been afforded a great deal of discretion in assessing damage awards. *Sears Roebuck*

---

4. Alternatively, Kroger contends that Stanton was employed by both Kroger and Gateway and/or that Stanton was a borrowed servant. Typically, we analyze dual employment by applying the seven factors reiterated in *Hale v. Kemp*, 579 N.E.2d 63, 67 (Ind.1991). However, we need not engage in such an analysis in this case. The cases applying the seven factors generally do not include those where the dual employment alleged is between a parent corporation and its subsidiary. Because our supreme court in *McQuade* foreclosed the ability of a parent corporation to pierce the corporate veil defensively as Kro-

ger is attempting to do here, it is dispositive on the question of subject-matter jurisdiction in this case.

5. As a side note, Kroger does not contend that the jury was improperly instructed. In fact, Kroger recognizes the jury was instructed it could return a "fair" amount for pain and suffering and disability. Record p. 1880. A jury is presumed to have followed the court's instructions. *Landis v. Landis,* 664 N.E.2d 754, 758 (Ind.Ct.App.1996).

& Co. v. Manuilov, 742 N.E.2d 453, 2001 WL 51680 (Ind.2001); Dollar Inn v. Slone, 695 N.E.2d 185, 190 (Ind.Ct.App.1998), trans. denied. This discretion is not limitless, however. This court will set aside an award of compensatory damages as impermissibly excessive where it is apparent from a review of the evidence that the amount of damages is so great it cannot be explained upon any basis other than passion, partiality, prejudice, corruption, or some other improper element. To warrant reversal, the award "must appear to be so outrageous as to impress the Court at 'first blush' with its enormity." Kimberlin v. DeLong, 637 N.E.2d 121, 129 (Ind.1994) (quoting New York Cent. R.R. Co. v. Johnson, 234 Ind. 457, 127 N.E.2d 603 (1955)), cert. denied, 516 U.S. 829, 116 S.Ct. 98 (1995). Where the damage award is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or consideration of improper evidence, we will find the award excessive. Id. The jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reasonable ground. Dee, 636 N.E.2d at 178. When the evidence concerning the injury and damages is conflicting, the jury is in the best position to assess the damages and the jury's verdict cannot be said to be based upon prejudice, passion, partiality, corruption, or on the consideration of some improper element. Dollar Inn, 695 N.E.2d at 190. Our supreme court has summarized the standard as follows:

A personal injury award is not excessive where (1) the award was not based upon jury prejudice, partiality, or corruption, (2) the jury has not misunderstood or misapplied the evidence, (3) the award was not based upon consideration of an improper element such as liability insurance, and (4) the award was within the parameters of the evidence. Under such circumstances, we will not substi-

tute our judgment for that of the jury as to reasonable compensation for a plaintiff.

Kimberlin, 637 N.E.2d at 130 (citation omitted).

### B. Method of Analysis

With this standard in mind, the parties dispute the method of evaluating the reasonableness of the verdict. Kroger contends that a "comparability" analysis is appropriate whereby we would compare this verdict to similar cases in Indiana and across the country, particularly those that are similar with respect to pain and suffering and loss of consortium. Kroger cites both Indiana cases considering punitive damage awards and Seventh Circuit cases to support its position that the comparability approach should be applied in this case. Stanton counters that Indiana does not use the comparability method when evaluating compensatory damages and that each verdict must be evaluated individually based on the evidence in that particular case.

In examining the question of the proper method of analysis, we have reviewed the role of the jury in awarding compensatory damages. The relationship between judge and jury with respect to compensation is clear. The Seventh Amendment generally requires that the jury determine compensatory damages. Supreme Court doctrine, historical practices prior to the adoption of the Seventh Amendment, and functional considerations all indicate that determination of compensation lies at the heart of the jury's constitutional province. See Colleen P. Murphy, Determining Compensation: The Tension Between Legislative Power and Jury Authority, 74 TEX. L.REV. 345 (1995). Moreover, once the jury makes a decision about compensation, the Seventh Amendment constrains the ability of the judge to alter the award.

The role of the jury in awarding compensatory damages is clear. However, numerous practical problems arise when a jury is actually faced with calculating and awarding damages, particularly in areas where the damages are not easily quantified. Damages for pain and suffering are one such problematic component of compensatory damages. The process by which pain and suffering damages are awarded in the United States has been aptly called "procedurally simple but analytically impenetrable." David W. Leebron, *Final Moments: Damages for Pain and Suffering Prior to Death,* 64 N.Y.U. L.Rev. 256, 265 (1989). One author described the problem this way:

> An inescapable reality of the pain and suffering conundrum is that tort law requires the monetization of a 'product' for which there is no market and, therefore, no market price. This largely explains the lamented fact that the jurors who must undertake the monetization are given no 'absolute' standard by which to do it. There is none to give them. Each juror must create or bring their own standard to the courtroom.

Oscar G. Chase, *Helping Jurors Determine Pain and Suffering Awards,* 23 HOFSTRA L.REV. 763, 765 (1995).

◼ Despite the difficulties these issues pose, Indiana courts have found that awards for pain, suffering, fright, humiliation, and mental anguish are particularly within the province of the jury because they involve the weighing of evidence and credibility of witnesses. *See, e.g., Landis,* 664 N.E.2d at 757. "Physical and mental pain are, by their very nature, not readily susceptible to quantification, and, therefore, the jury is given very wide latitude in determining these kinds of damages." *Id.* (quoting *Groves v. First Nat'l Bank of Valparaiso,* 518 N.E.2d 819, 831 (Ind.Ct. App.1988), *trans. denied* ). Damages for pain and suffering are of necessity a jury question that may not be reduced to fixed rules and mathematical precision. *Dee,* 636 N.E.2d at 178. Where the damages cannot be calculated with mathematical certainty, the jury has liberal discretion in assessing damages. *Id.* Our inability to look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence.[6] *Griffin v. Acker,* 659 N.E.2d 659, 664 (Ind. Ct.App.1995), *trans. denied.*

◼ These principles, while easily stated, are not easily applied. The appropriate degree of oversight by a court into the decision-making process of the jury, especially in an area such as pain and suffering, is not an easy thing to determine. Affording a jury the discretion it is due while at the same time making sure the verdict is within the bounds of the evidence can sometimes be a difficult balance to strike. Kroger urges us to apply a comparability analysis to this verdict to assist in this process. In essence, Kroger maintains that because the verdict in this case is considerably larger than those in purportedly similar cases, it could not be

---

6. For example, this court has stated:
 We must confess we review the damages for emotional distress with some reluctance. We were not, after all, present to review the demeanor of the witnesses as they recounted the events which occurred here and the emotional trauma which the events induced; we are confined to review of a record which, no matter how accurate and detailed, can never convey the emotions and demeanor of the witnesses. Still, it is our duty to insure that the jury acted properly in assessing damages, and we may not shrink from this duty.
 *Groves,* 518 N.E.2d at 831.

found to be reasonably within the bounds of the evidence.

Our review of Indiana case law leads us to conclude that Indiana has not heretofore adopted the comparability analysis for evaluating compensatory damage awards. One Indiana case mentioned other verdicts in evaluating the propriety of a compensatory damage award. *See Groves,* 518 N.E.2d at 819. That case was a quiet title action in which an award of $100,000 was found to be excessive on the basis of an absence of evidence of any physical or psychological manifestation of mental anguish. In reaching that conclusion, the court considered a Seventh Circuit case, a Northern District of Indiana case, and a Louisiana appellate case for purposes of determining the extent of evidence required to support mental anguish damages. As such, the *Groves* court looked to other cases for guidance in evaluating a particular type of damages, those being for mental anguish in the absence of any physical manifestation of the anguish.

The vast majority of Indiana cases simply consider whether the verdict was reasonable in light of the evidence presented at trial. Indeed, some cases have specifically stated that each case should be considered on its own evidence.[7] For example, this court has stated that "[e]ach case will stand and fall on its own merit when an award is challenged as excessive, and an award will not be disturbed unless it is manifestly excessive." *Southern Indiana Gas & Elec. Co. v. Scoles,* 435 N.E.2d 287, 294 (Ind.Ct.App.1982); *see also Levin v. Schuckman,* 150 Ind.App. 254, 276 N.E.2d 208 (1971).

In addition, in *State v. Thompson,* 179 Ind.App. 227, 385 N.E.2d 198 (1979), the State's contention that the damages were excessive and that the jury was motivated by prejudice, passion, partiality, or corruption was based in part on the premise that it was the largest personal injury verdict entered to date in Indiana. In rejecting the State's argument, this court explained the "correct way to determine whether a verdict is excessive" was by first reconsidering the evidence introduced at trial. *Id.* at 251, 385 N.E.2d at 214. The court included a passage from *State v. Daley,* 153 Ind.App. 330, 287 N.E.2d 552, 556 (1972) (quoting *Kavanagh v. Butorac,* 140 Ind.App. 139, 221 N.E.2d 824 (1966)), which stated:

> For a formula then, our common law sets only the general guidelines for compensating the victim, each in its own way to be considered by the trier of facts and weighed to determine what the total compensation will be. Because of the personal nature of each case and since the decision is unique to the particular set of facts our courts have said the trier of facts is to be given 'sound discretion,' and 'liberal discretion' where damages cannot be defined and calculated with mathematical certainty or by any exact standard.

*Id.* at 251, 385 N.E.2d at 214.

Furthermore, in *Kavanagh,* we stated:

> By nature, injuries personal to the individual are incapable of a more definite rule for measurement of damages. Each action is unique and it must be so treated and determined on the facts peculiar to that matter. Because our law seeks to individualize the solution to the problem of properly compensating the victim of torts, no overall expedient applies in every case.

---

**7.** This statement also holds true in at least one jurisdiction where a comparability analysis has been used. *See Wheat v. United States,* 860 F.2d 1256, 1259–60 (5th Cir.1988) (stating that "damage awards in analogous cases provide an objective frame of reference, but they do not control our assessment of individual circumstances").

*Kavanagh,* 140 Ind.App. at 145, 221 N.E.2d at 828. We noted that the appellant had documented numerous cases to show that the judgment in question far exceeded what had been allowed in Indiana and elsewhere for what it contended were comparable injuries. Yet, we concluded that "[w]e are not able to say the loss of an eye in one case is worth the same or just about the same in another case. If such a system is to be desired (and we express no sentiment for such idea) it must come from legislation. Our common law requires each case to rest finally on its own merits." *Id.* In reaching that conclusion, we called attention to language of the Supreme Court of Louisiana:

> [C]ases relied upon may be similar in that each of them involves a similar injury such as a broken arm, the loss of an eye or eyes, or the loss of some member of the body. Thereafter, however, the similarity ceases for each case is different, and the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to the case under consideration. The primary purpose of the judge or the jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case.

*Id.* at 146, 221 N.E.2d at 828 (quoting *Gaspard v. LeMaire,* 245 La. 239, 158 So.2d 149, 158 (1963)). After commenting that the determination of the amount was not our decision, we cited long-standing Indiana Supreme Court precedent stating, " '[t]hat the jury assessed higher damages than we would have done, is no reason why we should set aside the verdict.' " *Id.* at 146, 221 N.E.2d at 829 (quoting *Chenowith v. Hicks,* 5 Ind. 224, 226 (1854)).

Our supreme court recently confirmed the principle that the jury has broad discretion in determining damage awards.

*Sears Roebuck,* 742 N.E.2d at 460–61. The court noted that damages are particularly a jury determination and that appellate courts will not substitute their idea of a proper damage award for that of the jury. *Id.* The court reiterated:

> Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence. We cannot invade the province of the jury to decide the facts and cannot reverse unless the verdict is clearly erroneous.

*Id.* (quoting *Annee v. State,* 256 Ind. 686, 271 N.E.2d 711, 713 (1971)).

It is clear that Indiana courts have not previously adopted a comparability analysis for evaluating compensatory damage claims. More importantly, they have historically expressed disfavor in evaluating cases other than on their own merits. That being said, however, the obvious concern raised on the face of this verdict is the great disparity between it and other compensatory damage awards in Indiana cases.

We recognize that variability among awards is a problem primarily because it undermines the legal system's claim that like cases will be treated alike; the promise of equal justice under law is an important justification for our legal system. Criticisms of variability include the contention that it makes it harder to predict verdicts and, in turn, to settle cases, thereby adding unnecessary transaction costs to the tort system and delaying payment to plaintiffs. *See* David Baldus et al., *Improving Judicial Oversight of Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards for Nonpecuniary Harms and Punitive Damages,* 80 Iowa L.Rev. 1109 (1995); Judyth W. Pendell, *Enhancing Juror Effectiveness: An Insurer's Perspec-*

*tive,* 52 LAW & CONTEMP. PROBS. 311 (1989). Furthermore, we acknowledge that inadequate notice of the limits of potential liability may impair planning for risk management, resulting in the overinvestment in liability avoidance, suppression of innovation, and higher insurance costs.

A certain level of inconsistency, however, is inherent in the jury system and is unlikely to be eliminated because the discretion exercised by juries supports basic democratic values recognized in the Seventh Amendment right to a jury trial and similar provisions in most state constitutions. *See* Baldus, 80 IOWA L.REV. at 1118. As that article points out, "moral diversity has been preferred to uniform outcomes imposed by rulemaking elites" and "some inconsistent awards may result not from the role of the jury, but rather may simply reflect superior lawyering purchased in a free market, or the 'luck of the draw' that is inherent in all social institutions." *Id.*

As one author observed, "there is . . . no standard man, no reasonable man afoot in the law of damages." Kalven, *The Jury, the Law, and the Personal Injury Damage Award,* 19 OHIO ST. L.J. 158, 160 (1958). It may be extremely difficult to determine an adequate and appropriate amount of money to compensate an injured person for feelings of pain and suffering, or for lost biological functioning, professional standing, or business opportunity. Identical injuries may have radically different effects on different plaintiffs. Because we lack the ability to attach price tags to given functions and talents, the translation of social wrongs into dollars and cents is problematic at best.

If a comparability analysis is applied to reduce awards exceeding the range of purportedly similar cases, the effects are far-reaching. Because a comparability analysis effectively places a "cap" on the jury's award regardless of the evidence, it can be considered to be second-guessing jury decisions in a manner not permitted by the Seventh Amendment. Without express statutory authority, no decisionmaker should have the power to alter a jury's award without regard for the evidence. If a jury's award can be subject to being set aside for exceeding an applicable range, the charge of the jury to fully compensate the plaintiff would no longer be paramount. The jury's decision on the amount of compensation would be replaced with a figure within the "comparable range." Although the jury would still find facts and calculate an amount that would compensate the plaintiff, it is disingenuous to claim that restricting the award after the fact by comparing it to other cases would not change the functioning of the jury by effectively rendering it less of a final decisionmaker and more of an advisory jury. The comparability analysis renders illusory the jury's discretion to compensate a victim.

This kind of encroachment on the traditional exercise of jury discretion is of particular concern when an appellate court, which has not heard the evidence in the case, conducts a de novo review that gives little or no deference to the ruling of the trial court or the verdict of the jury. Given the uncertainty that accompanies the assessment of compensatory damages not fixed by legal rule, an outright adjustment of the jury's award by the judge would simply be a substitution of the judge's opinion for that of the jury. The right to jury determination of compensatory damages would become a hollow guarantee. This concern is perhaps most salient in the context of judicial review of jury awards for noneconomic damages because a jury, applying a subjective standard of measurement, conceivably has a better sense than a judge in determining an appropriate amount of compensation. A judge's review

of a jury award would diminish the significance of the facts of the case that underlay that award.

Furthermore, because all cases are unique, the search for comparable or similar cases is inherently flawed. The nature and extent of pain and suffering are seldom, if ever, alike in any two cases. These differences in the details of the harms and the circumstances of plaintiffs inevitably make a comparison of the verdicts difficult if not impossible. The inherently subjective basis of awards for pain and suffering confounds the measurement and quantification required for an accurate comparison. There simply are no standards by which to measure the effects of injuries or to convert them into dollar amounts. Similarly, the data currently available to many courts is inadequate to support a viable system of comparative review. Another problem is that the reported decisions used as comparison cases are likely unrepresentative of all damages awards approved by courts or agreed to by parties in comparable cases. The reported facts in these cases bearing on the level of nonpecuniary harm are often sparse or nonexistent. The comparison of cases can be easily manipulated, particularly when the factual bases for the awards in those cases are frequently not reported in great detail.[8] Each case is normally evaluated in terms of only a limited number of characteristics. Because of the uncertainty and variability associated with pain, suffering, and loss of enjoyment of life, comparing cases on that basis may have even less validity than comparing for other types of damages.

We recognize that there is a public policy concern with respect to seemingly excessive jury verdicts[9] and believe that verdicts not supported by the evidence must be set aside or reduced as violative of the law. In so doing, some type of comparative analysis may, under certain circumstances, be necessary to evaluate particular types of damages or to determine whether the size of a particular verdict indicates jury passion or prejudice. Although it may be tempting to engage in such a comparative analysis to aid us in the difficult task of evaluating such a large award as is at issue in this case, to do so would be a significant departure from Indiana's historical regard of the uniqueness of every tort claim and the belief that compensatory damage assessments should be individualized and within the discretion of the factfinder. After reviewing all of the testimony and evidence presented to

8. This case perfectly illustrates our concern with comparing damage awards to other cases. If this case were written in a manner similar to other reported personal injury cases, it would likely merely contain a summary of Stanton's injuries, probably consisting of something to the effect that he suffered severe injuries including a crushed pelvis, underwent multiple surgeries, and had several complications. The opinion would indicate that he is permanently disabled and will continue to have pain and complications from his condition. However, without a more thorough description of the injuries, the complications, the effects of the medical problems on his life, and the profound devastation the accident has caused him and his family, which we undertake to provide later, it would be impossible for any other case to be compared accurately to this one.

9. Interestingly, a recently released U.S. Department of Justice survey "basically nullifies the long-espoused notion that lay people layer on unnecessary damages in civil litigation cases." Denise G. Callahan, *Judges Just As Generous As Juries*, INDIANA LAWYER, Jan. 17–30, 2001, at 1. The survey studied 45 of the country's largest counties, including Marion County, Indiana, and concluded that judges favored plaintiffs more often than juries in tort cases and that the judges awarded slightly higher damages than juries overall. *Id.* at 27.

the jury, it is clear to us that such a departure is not necessary here.

### C. Evidence in this Case

The record is replete with evidence that Stanton was an active person before the accident, heavily involved in his community and outdoor sports. He was at various times a dog catcher and part-time police officer. He coached Little League and was very active in the local Men's Club. He coached for one of his daughters' softball teams every year, including traveling teams and All Stars. He took care of the ball diamonds for the community.

Stanton remembers being hit by the tractor:

> Well, on the original hit, I felt my pelvis break. I say 'my pelvis'; I really don't know what bones it was. And then it was like a pause and it started back again. And I could feel it crunching, and then there was another pause, and it started back again. I could feel my ribs start breaking.... I felt it hit me, and then I felt the bones start breaking.

Record p. 3616. An eyewitness described it this way:

> When I saw him go up underneath the trailer, I just knew he was cut half in two. I didn't think he'd ever live over this ordeal. And then when [Ritter] pushed him up underneath there, [Ritter] had to see because he snatched him right back out from underneath it.

\* \* \* \* \*

> [Ritter] put it in forward gear and jerked him back out from underneath the trailer.

Record p. 2715.

The initial assessment of Stanton in the emergency room revealed that he suffered an "open book" pelvic fracture with vertical shearing, hemorrhagic shock, fractured ribs, hemopneumothorax (blood in his chest), internal bleeding from the pelvic fracture, and a lung contusion. He was later diagnosed with a large scrotal hematoma, swelling of the testicles, swelling of the penis with infection, and necrosis secondary to demodialysis. He developed a foot drop and a fungal infection in the area of the injury. He developed effusion (fluid on the lungs), which caused respiratory distress syndrome and required treatment with a ventilator. He developed several other complications.

Anna, one of the Stantons' daughters, testified that Alfie cried the whole way to Indianapolis from Illinois when they found out about the accident. She described her mother as being in shock and devastated, "rushing back and forth, saying we had to go get daddy." Record p. 3087. Alfie testified that on the day of the accident, "They told us that there was no hope for him, and it would be amazing if he made it through the night." Record p. 3452. Another one of the Stantons' daughters, Lynn, remembered the doctors' prognosis:

> They—the doctors flat said he won't make it most likely through the night. He said it will be minute by minute. You need to stay here throughout the night, because at any time he will go. We don't expect his chances—he doesn't really have any chances, is what they pretty much said.

Record p. 3108. Lynn stated that when she first saw her father:

> [I]t didn't look like him. He was about three times as big as he normally was. And the doctors told us, you won't recognize him, and we thought, yeah, we'll recognize him. It's your dad, you know. But he was really swollen. They said that was from all the blood.

Record p. 3108. Their other daughter, Christy, testified that "he just looked horrible. I just, you know, started crying.

And then my mom, you know, she was freaking out. She was, you know, patting his head, Jerry, I love you, you know, you're going to be okay, you know." Record p. 3027.

It was approximately a month before he was stable. The record contains evidence that Stanton had to be resuscitated numerous times. In fact, the hospital staff kept a "crash cart" right outside his hospital room for several days. Lynn remembered one life-threatening event:

One of his surgeries—actually he had had a 14 hour surgery, and they were taking him up in the elevator, and they had actually got him stuck in the elevator and he had collapsed.

And I was watching the nurse literally get on top of my dad in the elevator, because the doors were pried open, and he was half stuck in and half stuck out, and was on top of him trying to revive him. He had actually died in the elevator.

Record p. 3110.

Stanton was kept in an induced coma for considerable period of time. Alfie testified that when he woke up, "he couldn't talk. That was painful, because he wanted to communicate with us, but he couldn't because he had the trach in or the tube in his throat. And you could tell by just looking at him that he was so scared." Record p. 3501.

Dr. Thomas Ambrose, one of the orthopedic surgeons who treated Stanton, summarized Stanton's pelvic injuries as follows:

Mr. Stanton sustained a crushing injury to the pelvis. This is a compression of the pelvic bone itself with multiple fractures through both iliac wings. The iliac wings are the bone that support the hip joint. In fact, the sockets of the hip joint were on both sides fragmented into multiple pieces.

Record p. 2962. He further described the injury:

In these types of fracture patterns and this severity of fracture, the chances of mortality or death from this type of injury is about 50 percent. The fact that he survived was probably—he was on the window of being crushed to death, and the fracture patterns were some of the most severe that I have seen in ten years of practice.

Record p. 2965. In addition to the fractures, Stanton suffered massive soft tissue injuries, which Dr. Ambrose described as "massive crushing of both the muscles around the bone, as well as avulsion or pulling away of the skin from the underlying deep fascia or covering of the muscles. This was, indeed, a significant factor in his overall injury index." Record p. 2966. Stanton also sustained traumatic injury to the nerves in the pelvic region and blood vessels in that area.

Initially, a ten-hour surgery was performed. During that surgery, the doctors were successful in "putting the pieces back together" of portions of the left pelvic bones in a near anatomic position using plates and screws. Record p. 2969. Before they were able to conduct another surgery to repair the right side, however, Stanton developed an infection. Because of the tremendous amount of muscle damage at the time of the injury, "countless" surgeries were subsequently necessary not only to clear infection but also to remove dead muscle, dead skin, and dead subcutaneous fat, as well as dead bone fragments that were involved in the infection. Record pp. 2971, 2979. The massive infection Stanton suffered was life-threatening and caused systemic toxic shock, which resulted in complications with various organs and caused renal failure.

Dr. Ambrose explained that the injury to the hip socket is "one of the most severe injuries that a human can sustain." Record p. 2983. He explained that the possibility of developing posttraumatic arthritis was substantial with a reconstruction of the hip joint, but virtually all patients who suffer displacement of the socket and have no surgery will suffer from the arthritis. He testified that although one of the goals of surgery is to repair the bone so the patient would have future use of it, another is to reduce the risks of arthritis. He explained that because of the massive infection, Stanton's prognosis with respect to future functional capability was not promising:

> As a result, the chances of going on to resume virtually normal function were diminished practically to zero. The patient lost a tremendous amount of muscle around the hip joint, so he wouldn't have a normal gait pattern. He also lost a fair amount of bone....

> \* \* \* \* \*

> He was not a candidate for a hip replacement, in my opinion, because of the involvement of the bone around the hip socket with infection.

> We already discussed the fact that you can never be completely sure of clearing a bone infection; and that another surgical insult to that bone may reactivate infection.

Record p. 2985. Explaining his ability to testify about Stanton without referring to his notes, Dr. Ambrose stated:

> Everyone—every surgeon in their career has several patients that they—that are standouts, if you will, that you remember for your entire career and into retirement.

> And there are about half a dozen, all of them having severe crushing-type injuries to the pelvis, that are readily re-

called. And Mr. Stanton is one of those. Again, the magnitude of the injury was so severe, and his complications were so severe, and we cared for him on a very intensive basis over a period of several months. You're absolutely right; I can recall this patient as if several of these episodes were just a few weeks ago.

Record p. 3002.

As a result of the infection and the countless surgeries to remove dead tissue and bone, Stanton developed a very large open wound near one of his hips. The wound was open to the bone and required dressing changes several times a day to remove the drainage caused by the infection. Several witnesses testified that Alfie changed Stanton's dressings for the wound. Alfie testified that it hurt her to cause her husband pain when she changed his dressings. She stated that she generally changed the dressings once a day, but "[i]f it was real mucky, smelly, I might have to do it twice a day or three times a day." Record p. 3460.

Several people testified that the dressing changing was a tedious and painful process, complicated by the foul odor and debris coming from the wound. Anna stated, "they would use three packages of the coverall and a Q-tip, and they would just have to fill the hole in. And when you pulled it out, it would be bloody and it was infected, so it was a yellow. And the smell was just hard to describe." Record p. 3091. Christy described it as "nasty. There was just, you know, stuff coming out of it, a foul odor, and, I mean, [Alfie] wouldn't think twice but to take care of him." Record p. 3038.

One of Stanton's nurses was an expert in wound care at the Rehabilitation Hospital. She stated that it was "for me the worst wound I had ever seen." Record p. 3228. She described how painful the dressing

changes were for Stanton because he could feel them and explained that they dressed the smaller pressure sores before treating the large wound:

As you came back up his body and to the left side. We turned him over on the right side—now, the whole dressing change was very painful, and we gave him medicine through his IV at that time. Yes, I believe it was through his IV, because any changes in positioning were very uncomfortable.

We turned him to his right side to get access to the left, and with that you also noticed that there is multiple skin areas and grafts along his flank in front.

As we pulled the dressing off, there was another nurse in there with me, and I don't—it was very foul smelling. And you tried to keep your dignity when you're with a patient and not get sick or anything like that, but I know that just the smell of the drainage was pretty potent.

And we pulled the dressing off, and we were gowned and gloved, and just kept pulling and pulling and pulling dressing out. And you just—it had pieces of flesh on it, as well as red and yellow drainage coming out of this wound.

And part of the assessment, when you bring a patient in, is to measure their wound. And his was so deep, I could almost put my fist right into the area of the wound and reach around. And when I did, I did touch bone. And that was something that was not a very good experience for me or him, I'm sure . . . .

\* \* \* \* \*

. . . The pictures don't depict the depth of the wound, nor the drainage or odor that did occur with the wound either. Record pp. 3226–27. She further testified that the antibiotics he was taking caused Stanton to have diarrhea several times a day, which aggravated their attempts to keep the wound clean because he could not use a bedpan.

In addition to the injuries Stanton suffered to his pelvic region, he also lost vision in one of his eyes as a result of the trauma. With this condition, the eye typically becomes unsightly and painful as it begins to deteriorate, so Stanton may need surgery to remove the eye in the future. Because only one eye remains, the risk of total blindness is higher for him if something happens to his "good" eye.

The Stantons' daughters, as well as the doctors, testified that Alfie rarely left Stanton's side during his entire seven-month hospital stay. She slept on an air mattress in the intensive care unit and later slept in a chair. She left only to bring food from the cafeteria and to shower. Lynn remembered her mother saying, "[A]s long as he's here, I'm here." Record p. 3110. Their daughters stayed for extended periods too, particularly Christy, who stayed for approximately two months at the hospital away from her family. Anna, whose son was eight years old at the time of trial, stated that she took a thirty-day leave of absence from her job immediately following the accident and that later she worked four ten-hour days per week in Illinois so she could spend three days in Indianapolis to assist her parents while Stanton remained in the hospital.

At one point during his recovery, Stanton had breathing and feeding tubes. He was receiving daily dialysis because his kidneys had failed. When medical personnel had to reinsert the breathing tube because he needed surgery, Lynn stated, "he didn't want it. He fought it, you know. He would squeeze our hand and shake his head no. And he knew that, you

know, they were going to do it, but he didn't want it." Record p. 3113.

It took four to six weeks of physical therapy for Stanton to be able to go from a lying position to a sitting position because he had a difficult time "tolerating" it. Record p. 3321.

Alfie testified that Stanton was a modest person and that she bathed him so the nurses would not have to. She stated that the helplessness of his condition bothered him "[b]ecause he was a proud man. He wasn't letting, you know, somebody else take care of him. He always was the one who took care of everybody else, and he wasn't able to do that." Record p. 3453.

Before leaving the intensive care unit of the hospital, Stanton vowed he would return one year later and walk onto the ward. Anna described the one-year anniversary this way:

> There was a set of double doors at the front of the entrance, and he wheeled up to the doors. And he was probably eight steps from the nurse's desk, and he walked in. And they all gathered around him, and they all clapped because they didn't believe that he would actually walk back there.

Record p. 3093. Although he was able to walk short distances with a walker at one point, it became too painful for him to do so after another bone infection and a series of surgeries in 1997. At that time, the top portion of the femur (the ball) and other bone from his hip was removed. As a result, one of his legs is several inches shorter than the other one. One doctor described walking after that surgery as having two rough bones rub against each other because of the absence of ligament to cushion the bones.

In addition to the surgeries Stanton underwent on his hips, he also had surgery for a penile implant. The injuries he sus-tained in the crash prevented him from functioning normally, and the doctors believed an implant would enable him to engage in sexual relations again with Alfie. Despite his increased risk of infection due to the complications he suffered from his other surgeries, Stanton elected to proceed with the implant. In all likelihood, Stanton will need to undergo additional surgery to replace the implant several years from now. Alfie testified that she and Stanton had a very sexual relationship before the accident. She testified that their physical relationship was important to both of them. She stated that unfortunately, although Stanton had a penile implant inserted, they have been unable to successfully have intercourse because they have not been able to find a position that is comfortable for Stanton.

Stanton rarely leaves his home. The evidence was clear that he suffers tremendous pain if he sits more than two hours at a time or if he overexerts himself. He explained his neck pain as follows:

> That's where I had one of those big bed sores, and all the meat was gone down to the bone just about. And what I would say it is, is the muscles are detached there, and they will kink up and just cause like a charley horse in the side of my neck.

Record p. 3670. If there is dampness in the air, he is in constant pain. In addition, he is not able to maneuver his large wheelchair into many locations, including several rooms of his house, his neighbors' houses, and even the bedroom of the hotel he stayed at during the trial. He is sometimes required to use freight elevators when he is out in public places.

The vocational rehabilitation counselor testified that after her evaluation and testing of Stanton, she concluded he is not suitable for employment because of the "totality of the situation ... It's being in a

wheelchair, no sight of the right eye, not being able to stand, not being able to sit for long periods of time, limitations that exceed any requirements of elemental jobs." Record p. 3269.

Stanton has a life expectancy of 25.4 years. Record p. 3677. When asked what his expectations are and what he wanted to do in the future, Stanton responded: "I'd like to be able to get my life back together where I got my own choices, where I could, you know, make my life count, have an impact on my family, the community." Record p. 3633. In responding to the question of what the worst thing was about his ordeal, Stanton stated, "Watching what it's done to my wife." Record p. 3633.

One of Stanton's friends summarized his future this way:

I think, and I'll say this since he isn't here, his toughest days are coming. He's got little grandchildren that's going to grow up, and it's going to be very hard for him not to be able to do the things that he has done with his children. I can just—I think he's going to have a very difficult time on that.

Record p. 3306. Christy testified that her father lives day to day because of the pain and that he "doesn't know—you can't make plans with him because he doesn't know if he's going to be able to get up that day. There is days where he's just hurting really bad, and he can't get up at all." Record p. 3041.

The devastating infection Stanton suffered was osteomyelitis, a bone infection, which is nearly impossible to treat completely and continues to be harbored in the bone for years, if not the remainder of the patient's life. There always remains a risk that the infection could be rekindled at some point in the future, particularly with surgery.

Alfie stated that in spite of everything he has been through, her husband is still pleasant to be around. She stated, "I mean my husband hasn't changed in that, because like I said, he's got his family. He's got me, you know. He's got friends, you know. He doesn't—he's really still the same person except for he's in the chair and he's blind, you know." Record p. 3492. However, one of the Stantons' neighbors described how, in his view, Stanton has changed as a result of the accident:

Well, he feels that he has lost the ability to take care and to protect his family, and that was always a very big issue with Jerry. And he's very limited in what he can do. And I think that bothers him because he was an independent person and did things for himself.

And an active person. I know he misses his hunting and his fishing. I mean, what do you want to say? He's changed.

Record pp. 3012–13.

Before the accident Alfie and Stanton purchased a motor home and planned to travel upon Stanton's retirement, which they had anticipated in January 1999. At the time of trial, the motor home was parked in the backyard at one of their daughters' houses. Annie testified that her son's father is not involved in his life and that Stanton was disappointed that he could no longer do the things that a father would for the child, including helping with Cub Scouts, fishing, and playing ball.

During his overall stay in the hospital, he received approximately 150 units of blood, which represents his total blood volume many times over. He underwent more than fifty surgeries and multiple episodes of resuscitation. He spent almost 300 days in hospitals.

In addition to the detailed, emotional testimony, Stanton offered pictures and videotapes into evidence. The pictures

demonstrated several things, including Alfie helping him up, the rooms of their house, and Stanton's inability get into several primary rooms in their house. The pictures also documented the progress of his open wound and depicted it and the other scars in graphic detail.

It is clear from the amount of the verdict that the extensive testimony and evidence had a profound effect on the jury. We conclude that it adequately supports the amount of damages awarded.[10] In so doing, we reject Kroger's claims that comments by Stanton's attorney during closing arguments "attempted to engender ill-will and a desire in the jury to punish Kroger" despite the fact that Stanton had dismissed his punitive damages claim. Appellant's Brief p. 27. Among the statements alleged to have been intended to inflame passion against Kroger were comments relating to Kroger's being the reason the case was at trial, to the jury's being the only thing that could stop Kroger from running over Stanton a second time, to Kroger's wanting to leave Stanton on his own with no remedy, and to Stanton's forgiveness toward Ritter for his "terrible mistake." Record p. 3984. Kroger claims there "is no question that the closing argument was a direct invitation to the jury to ignore the law and punish Kroger or to make an award based largely on sympathy." Appellant's Brief p. 28.

The first problem with this argument is Kroger's failure to object to any of the statements during trial. Indiana law is clear that to preserve statements of counsel for appellate review, the opposing party must promptly interpose and state its objection to the language or argument and request the court to so instruct the jury as to counteract any harmful effect of such language or argument, and if granted and such instructions were not sufficient to cure the error, follow such action by motion to have the submission set aside. *Dayton Walther Corp. v. Caldwell,* 273 Ind. 191, 402 N.E.2d 1252 (1980) (finding the issue waived and quoting *Gamble v. Lewis,* 227 Ind. 455, 85 N.E.2d 629, 635 (1949) as stating, "[w]e cannot permit litigants to gamble on the possibility of a favorable verdict, and, after an adverse verdict has been returned, set it aside on appeal when the losing parties failed to move that the submission be set aside when the alleged error occurred."). If the statements were as objectionable as Kroger now claims, then certainly it had an obligation to object and request an admonishment during trial.

The second problem with Kroger's claim is that there is no way to determine whether these statements alone formed

---

**10.** With respect to Kroger's challenge to the evidence presented for future medical expenses, the jury completed a summary form, so there is no way to know how much of the total award, if any, the jury allocated for future medical expenses. However, we conclude that the evidence is sufficient to support a significant award for future expenses based on the testimony regarding the treatment he will likely face in the future for his hip, his penile implant, his eye, and further complications caused by his bone infection. On appeal, any uncertainty as to the exact amount of damages is resolved against the wrongdoer. *City of Fort Wayne v. Capehart–Farnsworth Corp.,* 127 Ind.App. 412, 424, 142 N.E.2d 442, 448 (1957) (citations omitted), recites the rule:

It was the tortious act of appellant which created this situation and all doubts and uncertainties as to the proof of the exact measure of damages must be resolved against it. '... [A]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim ... The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created....'

the basis of the verdict against Kroger. This court will reverse a judgment due to improper argument of counsel only where it appears from the entire record that the remarks from counsel were "in all probability, the basis for securing an incorrect verdict." *Chaiken v. Eldon Emmor & Co.,* 597 N.E.2d 337, 345 (Ind.Ct.App.1992), *trans. denied.* The record contains extensive evidence, including graphic photographs, of Stanton's massive, permanent injuries that have prevented any sort of normal life for him and his family and cause him constant pain. In addition, Kroger defended itself at trial on the basis that Stanton was totally at fault for the accident. In fact, Kroger's expert insisted that Ritter was not at all responsible for the accident and even agreed with Stanton's counsel's characterization of Ritter as being "innocent as a newborn babe that wasn't even on the scene." Record p. 3870. In light of the testimony of Kroger's own supervisor, whose investigation of the accident resulted in the conclusion that Ritter was at fault for the accident and that Stanton was partially at fault, Kroger's continued insistence that Ritter bore no responsibility for the accident could have made a particularly strong impression on the jury. It is not feasible in a case such as this to decide with certainty that the statements during closing arguments formed the basis for an incorrect verdict. This is particularly true in light of the jury's critical evaluation of the evidence resulting in a finding that Stanton was 20% at fault for the accident. If the jury had done as Kroger claims and acted purely to punish Kroger with no regard for the evidence, it would not have sifted through the expert and lay testimony to come to the conclusion that Stanton bore a quantifiable amount of responsibility for the accident. The reduction in the verdict to reflect Stanton's comparative fault indicates to us that the jury exercised its discretion to evaluate and weigh the evidence to reach a conclusion regarding damages. This process is precisely the function that is within the heart of the jury's constitutional province.

The jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reasonable ground. *Dee,* 636 N.E.2d at 178. The record is replete with evidence of devastating injuries, permanent disabilities, continuing pain and suffering, and loss of consortium. We see no indication that the jury acted out of prejudice, passion, or partiality. Therefore, to warrant reversal, the award "must appear to be so outrageous as to impress the Court at 'first blush' with its enormity." *Kimberlin,* 637 N.E.2d at 129 (quoting *New York Central Railroad Co. v. Johnson,* 234 Ind. 457, 127 N.E.2d 603 (1955)). Although the amount of the award in this case is sizeable, we cannot conclude that it is outrageous given the evidence.

### D. Constitutional Implications

Kroger makes a brief attempt to argue that the size of the award violates due process and equal protection under the United States Constitution and due course of law under the Indiana Constitution. Kroger contends that an unfettered right to a jury trial in civil cases does not equate to the unfettered right to award any amount of damages.

Kroger's due process and due course of law challenges essentially amount to the contention that because the award was "grossly excessive," Kroger had no notice that such an award of general damages was even remotely reasonable or possible. Kroger claims existing case law provided notice to Kroger that a "verdict improperly focused on punishment would

be remitted" and that it "had the right to rely on existing case law which showed the highest comparable verdicts in the range of $3–7.5 million." Appellant's Brief pp. 42, 43. Kroger cites no authority discussing the notice issue with respect to an award of damages and provides no further argument developing the contention. Kroger's argument first presupposes that the verdict is excessive and beyond the scope of the evidence. We have already concluded that the verdict is within the parameters of the evidence. Second, Kroger's argument that it had no notice a verdict this high was possible assumes that the comparability analysis should be applied in this case to compare it to other verdicts in cases with similar injuries. We have already declined to apply a comparability analysis to this case. Even if we had used such an analysis, however, Kroger was not deprived of notice simply because this verdict was higher, even substantially higher, than others like it because every case ultimately depends on the evidence presented in that particular case. A verdict that is higher than others may still be affirmed under a comparability analysis if it is deemed to be reasonable and within the scope of the evidence. Indiana law is clear that a tortfeasor will be liable for injuries caused by its wrongdoing to the extent the damages awarded are within the scope of the evidence and not motivated by passion, partiality, prejudice, corruption, or some other improper element. As such, Kroger had ample notice that it could be liable for any damages found not to be excessive for its wrongdoing.

▮ Kroger also makes the broad allegation that an equal protection violation occurred because the jury treated it differently than it would have treated an individual. This argument fails. First, the verdict was entered against both Kroger and Ritter. That fact hinders Kroger's accusation that the jury acted more harshly than it would have if Kroger were an individual. If there is no disparate treatment, then there can be no basis for claiming discrimination. *See State v. Costas,* 552 N.E.2d 459, 460 (Ind.1990) (noting that the denial of equal protection can take either of two forms: (1) the law itself discriminates on its face against a protected class of persons, or (2) the manner in which the law, which is otherwise constitutional, is administered by state officials discriminates against a protected class of persons). Second, because we conclude that the award is within the scope of the evidence, we see no merit to Kroger's constitutional claims.

### Conclusion

The trial court did not abuse its discretion when it denied Kroger's motion to dismiss for lack of subject-matter jurisdiction. Given the circumstances in this case, we find no basis for allowing an exception to the holding by our supreme court in *McQuade.* The trial court was within its discretion to conclude that the Stantons' claims were not barred by the exclusivity provision of the Act. Furthermore, we are unpersuaded that the jury verdict in this case is great enough to be characterized as so excessive as to indicate prejudice. We cannot say as a matter of law that the suffering of Stanton and his wife is worth less than the jury's award, and where there is credible evidence to sustain the jury's discretion, we will not find that discretion abused.

Affirmed.

BAILEY, J., and RILEY, J., concur.