FILED

Dec 28 2017, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR
APPELLANT/CROSS-APPELLEE

Thomas W. Vander Luitgaren
Emily M. Gettum
Greenwood, Indiana

ATTORNEYS FOR APPELLEES/CROSS-
APPELLANTS

Timothy H. Button
Laura S. Reed
Justin O. Sorrell
Riley Bennett Egloff LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeff West,

*Appellant/Defendant/Cross-Appellee/Counterclaim Plaintiff,*

*v.*

J. Greg Allen Builder, Inc., and Princeton Homes,

*Appellees/Plaintiffs/Cross-Appellants/Counterclaim Defendants,*

and

Greg Allen,

*Cross-Appellant/Counterclaim Defendant.*

December 28, 2017

Court of Appeals Case No.
41A01-1701-CT-182

Appeal from the Johnson Superior Court

The Honorable Marla Clark, Judge

Trial Court Cause No.
41D04-1102-CT-14

**Bradford, Judge.**

# Case Summary

[1] Appellant/Defendant/Cross-Appellee/Counterclaim Plaintiff Jeff West served as president of J. Greg Allen Builder, Inc. ("GABI"), beginning in 2002 and Princeton Homes ("Princeton") beginning in 2008. Appellees/Plaintiffs/Cross-Appellants/Counterclaim Defendants GABI and Princeton were founded and owned by Cross-Appellant/Counterclaim Defendant Greg Allen (collectively, "Cross-Appellants"). While president of GABI and Princeton, West, with the assistance in some cases of Kim Hutchinson, directed multiple unauthorized payments to himself and others, oversaw multiple unauthorized transfers of funds from Princeton to GABI, borrowed money from GABI that he did not repay, failed to maintain proper records, and caused GABI to fail to fulfill certain contractual obligations. After discovering West's activities, Allen sent a letter to GABI's and Princeton's subcontractors, suppliers, and certain customers indicating that West and Hutchinson had withdrawn company funds for their own use and disguised the withdrawals as payments to a lumber company.

[2] In February of 2011, Princeton and GABI sued Hutchinson and West, making claims against West for violating GABI's employee manual, conversion, theft, unfair competition, negligence, tortious interference with a business relationship, usurpation of corporate opportunity, misappropriation of trade secrets, unjust enrichment, and fraud. West filed a countersuit against Cross-Appellants for, *inter alia*, defamation. Following trial, a jury found in favor of GABI and against West on the theft claim in the amount of $4000.00 and on

the breach of fiduciary duty claim in the amount of $220,000.00. The jury also found in favor of West on his defamation counterclaim, awarding him presumed damages of $50,000.00 against each Cross-Appellant and punitive damages in the amount of $300,000.00 against Allen, which the trial court later reduced to $150,000.00. West contends that there is insufficient evidence to sustain the jury's verdict against him for breach of fiduciary duty or the amount of damages awarded on that claim. Cross-Appellants contend that there is insufficient evidence to sustain the jury's verdict against them for defamation or the award of punitive damages against Allen. While we disagree with the first three contentions, we agree that there is insufficient evidence to sustain the award of punitive damages against Allen.

## Facts and Procedural History

[3] Allen founded GABI in 1986 and Princeton in the late 1990s. GABI built custom homes, and Princeton built semi-custom homes. Allen was president of GABI until West became president in 2002. West also became president of Princeton in December 2008. West hired Kim Hutchinson to be his assistant, type contracts and specifications, perform basic accounting and data entry, issue checks, and keep the books for GABI and Princeton.

[4] As president of GABI and Princeton, West's responsibilities included supervising employees (including Hutchinson) meeting with customers, making sales, managing customer relationships, creating budgets, controlling budgets and costs, overseeing the construction process, bidding on construction projects,

obtaining bids from subcontractors and suppliers, forecasting annual overhead, reviewing reports of income and expenses, approving bills, and providing monthly financial reports to Allen. West received compensation from GABI of $338,367.80 during that time period.

[5] During West's presidency, GABI and Princeton both used an accounting software system called "Timberline." Hutchinson was the primary employee who input data into Timberline for both GABI and Princeton. West prepared financial statements, such as balance sheets, which Hutchinson then typed into the computer system. With some regularity, Allen received reports generated by the Timberline system, and his knowledge of the condition of GABI was limited to what West reported. Bills that came in for GABI and Princeton were separated by company and job and sent to Hutchinson, who provided them to West for approval. It was West's responsibility to direct Hutchinson which bills to pay, after which Hutchinson would issue the checks.

[6] West resigned from GABI and Princeton on June 3, 2010. Brent Glover resigned a couple weeks later. Hutchinson resigned on August 27, 2010. After West left, an internal investigation began in June of 2010. This investigation uncovered numerous accounting discrepancies and financial irregularities.

[7] For example, before the end of December 2009, Allen sent an email to all company employees stating that there would be no bonuses that year. However, on December 29, 2009, Hutchinson, at West's direction, issued bonus checks, including a $2000.00 check to West, a $1000.00 check to

Hutchinson, and a $1000.00 check to Glover. At West's direction, these bonus checks were posted from the construction account (not payroll) and were posted in Timberline as if they had been written to Carter Lee Lumber Company. Furthermore, approximately twenty additional unauthorized checks worth approximately $80,000.00 or $90,000.00 were written to West from the construction account. All of the checks were concealed by having been falsely posted in the Timberline system. While Hutchinson was under West's supervision, similar checks were issued to Hutchinson totaling over $400,000.00 and were also concealed by being falsely posted as payments to Carter Lee.

[8] It was discovered that files were missing numerous documents and records, including purged checks. Almost all of the checks that were missing were posted in the Timberline system as being paid to Carter Lee. It also was discovered that health insurance costs had been paid out of GABI's construction account as direct costs when they should have been paid and characterized as indirect costs. Numerous unauthorized inter-company transfers were uncovered, namely fifteen to sixteen unauthorized transfers from Princeton to GABI between December 2008 and June 2010, totaling approximately $655,000.00, for which the proper procedures were not followed. All of these funds were transferred directly from Princeton to GABI, in contravention of established company policy.

[9] Accounting discrepancies were discovered relating to homes which had been built for West and his son, Evan. The investigation revealed that a promissory note related to West's house existed which had not repaid, and about which

Allen had been unaware. Further, in August 2009, Allen discovered that West, without Allen's knowledge or approval, had begun building a home in downtown Indianapolis for West's son, Evan. When Allen asked West about the home, West admitted it was for his son, and asked for an employee discount, which Allen granted on the condition that West get accounting personnel from another division to watch the books to avoid preferential treatment. West built the home, but never obtained the required oversight from another accounting division. West also made numerous improvements to Evan's home, which were not indicated in the budget presented to Allen and were not charged to Evan. As of West's resignation from GABI on in June 2010, GABI still was owed approximately $58,000.00 for Evan's home and approximately $54,000.00 for West's home.

[10] Serious accounting discrepancies were uncovered regarding amounts due to subcontractors and suppliers. Soon after West's resignation, GABI began receiving phone calls from subcontractors and suppliers, asking for the money they were owed. Further investigation revealed that many of GABI and Princeton's records were inaccurate, including balance sheets, records of outstanding debt, and accounts payable. For example, the accounts-payable records consistently under-reported the amounts owed to subcontractors and suppliers, in some cases by as much as ninety percent. The amount owed to Carter Lee Lumber was under-reported by approximately $300,000.00, the amount owed to Collins Drywall approximately $160,000.00, and the amounts owed to several other subcontractors were under-reported as well. Allen ended

up using $803,000.00 of his personal funds to cover the shortfall. As of West's resignation, GABI owed its subcontractors and suppliers approximately $2.4 million, all of which debt had been incurred before West's resignation. Moreover, on December 15, 2009, when Allen met with West to discuss cash flow, West informed Allen that he projected $465,000.00 of gross profit. As it happened, there was no meaningful profit.

[11] On October 1, 2009, Mark and Alicia Fujihara entered into a contract to buy their first home from GABI. At closing in June of 2010, the Fujiharas asked whether they would receive documentation proving they owned their home, and West informed them that Hutchinson was working on the deed and would send it to them later. The Fujiharas did not receive a deed at closing, or even shortly after. Instead, after closing, the Fujiharas received demand letters from contractors who had not been paid by GABI under West's watch, which forced GABI to retroactively pay the contractors. Further, in breach of its contract with the Fujiharas (again under West's watch), GABI failed to provide the Fujiharas with title insurance. Allen himself was forced to provide personal funds of approximately $65,000.00 to pay for the lot on which the Fujiharas' home had been built so that GABI could give a deed to the Fujiharas.

[12] After West's departure, Allen and other staff discussed with Hutchinson the unpaid promissory note and the unpaid vendor invoices, at which point Hutchinson responded that she was just doing what West told her to do. On June 30, 2010, Hutchinson prepared and signed a statement ("the Statement"). In the Statement, Hutchinson admits that West directed her in late 2009 to

write checks to herself, Glover, and West as bonuses and to book those payments as payments to Carter Lee Lumber to conceal the payments from Allen. Hutchinson also admits West directed her to make draws of approximately $625,000.00 on Princeton's line of credit, and rather than use those funds for Princeton jobs as they were drawn, to transfer those funds to GABI to pay its expenses, and to conceal the payments. West also instructed Hutchinson not to tell Allen that GABI was operating at a substantial loss and had incurred and accumulated substantial unpaid bills. Hutchinson later testified that she signed the Statement despite believing it to contain falsehoods.

[13] Following these discussions with Hutchinson, Allen confronted West about what he had done. Allen presented West with a document showing what Allen knew about as of that date, and substantiating amounts West should pay back to Allen and GABI. In total, Allen asked him to pay back $196,546.00. When Allen showed West the Statement, he agreed that he would pay the amounts back.

[14] Following that interaction, Allen discovered that West owed GABI and/or Allen approximately $303,862.61, including: $56,765.00 for the promissory note on West's personal home; $82,448.76 for interest on the promissory note through September 10, 2010; $55,000.00 which was underpaid on West's son's home; and $2199.00 in interest due for using company money for an extra five months after closing on West's son's home without Allen's knowledge. On January 18, 2011, Allen issued a letter through GABI and Princeton ("the Letter") to those entities' subcontractors, suppliers, and certain customers in

Marion and Johnson Counties, indicating that West and Hutchinson had engaged in a mismanagement scheme, including financial misreporting and unauthorized withdrawal of company funds.

[15]    On February 8, 2011, Princeton and GABI filed suit, asserting four claims against Hutchinson and eleven claims against West, namely, for violating GABI's employee manual, conversion, theft, unfair competition, negligence, tortious interference with a business relationship, usurpation of corporate opportunity, misappropriation of trade secrets, unjust enrichment, and fraud. On April 1, 2011, West filed a counterclaim against GABI and Princeton for breach of settlement agreement and contribution and filed a wage claim. West also asserted a claim for defamation against all Cross-Appellants. On September 8, 2011, West moved to dismiss the fraud and unjust enrichment claims, which motion was granted as to the unjust enrichment claim and denied as to fraud.

[16]    On October 13, 2015, West moved for summary judgment on all remaining claims against him. On November 30, 2015, GABI and Princeton voluntarily dismissed the following claims against West: violation of GABI's employee manual, unfair competition, tortious interference with a business relationship, usurpation of corporate opportunity, and misappropriation of trade secrets. On February 10, 2016, the Court granted summary judgment in favor of West on the negligence claim and denied summary judgment as to the claims for breach of fiduciary duty, theft, conversion, and fraud.

[17]     Jury trial began on October 31, 2016, and concluded on November 10, 2016. The jury found in favor of West on fraud, conversion, and his counterclaim of contribution, awarding him $9135.35 against Princeton. The jury also found in favor of West on his defamation counterclaim, awarding him presumed damages of $50,000.00 against each Cross-Appellant and punitive damages in the amount of $300,000.00 against Allen, which the trial court later reduced to $150,000.00. Finally, the jury found in favor of GABI and against West on the theft claim in the amount of $4000.00 and on the breach of fiduciary duty claim in the amount of $220,000.00.[1]

# Discussion and Decision

## *Appeal Issues*

[18]     West appeals from the trial court's denial of his motion to correct error.

> In general, we review a trial court's ruling on a motion to correct error for an abuse of discretion. *Hawkins v. Cannon*, 826 N.E.2d 658, 661 (Ind. Ct. App. 2005), *trans. denied*. However, to the extent the issues raised by the City are purely questions of law, our review is de novo. *See Ind. BMV v. Charles*, 919 N.E.2d 114, 116 (Ind. Ct. App. 2009) ("Although rulings on motions to correct error are usually reviewable under an abuse of discretion standard, we review a case de novo when the issue … is purely a question of law.")[.]

---

[1] The jury also found in favor of GABI and Princeton and against Hutchinson for breach of fiduciary duty, awarding GABI and Princeton $500,000.00 and $100,000.00 in damages, respectively. Hutchinson does not participate in this appeal.

*City of Indpls. v. Hicks*, 932 N.E.2d 227, 230 (Ind. Ct. App. 2010), *trans. denied*. So, to the extent that West's claims present questions of law, we will review them de novo.

## I. Whether Sufficient Evidence Supports the Jury's Verdict Against West for Breach of Fiduciary Duty to GABI

[19] The jury found that West breached his fiduciary duty to GABI and awarded it $220,000.00 in damages. West argues that GABI introduced insufficient evidence to sustain the verdict. "Upon appellate review the standard by which the sufficiency of the evidence is measured is that such evidence must have the fitness to induce conviction; it must be adequate to support a conclusion in the mind of reasonable persons." *Beaman v. Hedrick*, 146 Ind. App. 404, 405, 255 N.E.2d 828, 829 (1970). "When a party seeks to reverse an adverse judgment on the basis of insufficient evidence," the court will not weigh the evidence or assess witness credibility. *Beck v. Mason*, 580 N.E.2d 290, 291(Ind. Ct. App. 1991) (citing *In re Paternity of Tompkins*, 542 N.E.2d 1009, 1013 (Ind. Ct. App. 1991)). Rather, the court "will look to the evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom, and will affirm if there is substantial evidence of probative value to support the judgment." *Id*.

[20] "Substantial evidence" is defined as "[a]dequate to support a conclusion[.]" *Haney v. Meyer*, 139 Ind. App. 663, 668, 215 N.E.2d 886, 889 (1966). When the court uses the term "probative value" it has been said that it means "evidence having quality of proof and having fitness to induce conviction." *Id*. (citing

*McCague v. N.Y., Chicago & St. Louis R.R. Co.*, 225 Ind. 83, 89, 71 N.E.2d 569, 571 (1947)). Where there is no evidence to support the verdict of the jury on a material point, it is well-settled that the judgment will not be allowed to prevail. *Michalik v. Pazdur*, 105 Ind. App. 325, 328, 13 N.E.2d 870, 872 (1938).

[21] "A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Farmers Elevator Co. of Oakville v. Hamilton*, 926 N.E.2d 68, 79 (Ind. Ct. App. 2010), *trans. denied*. "The standard imposed by a fiduciary duty is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation." *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 (Ind. 2001) (citing *Hartung v. Architects Hartung/Odle/Burke, Inc.*, 157 Ind. App. 546, 552, 301 N.E.2d 240, 243 (1973)). "'The fiduciary must deal fairly, honestly, and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests.'" *Id.* (quoting *Hartung*, 157 Ind. App. at 552, 301 N.E.2d at 243).

[22] We have little trouble concluding that the jury heard sufficient evidence to sustain its verdict that West breached his fiduciary duty to GABI. The record contains evidence that, at West's direction, unauthorized bonus checks were issued to himself, Hutchinson, and another employee, despite Allen's previous instruction that none of his entities were to issue bonuses. Also at West's direction, the true nature of these bonus checks was concealed in GABI's accounting software, with the checks made to look as if they had been issued to

a lumber supplier. All told, twenty additional unauthorized checks, totaling $80,000.00 to $90,000.00, were written to West, and were similarly concealed. Unauthorized health insurance costs were also paid out of GABI's construction account and had been improperly accounted for.

[23] The record also contains evidence tending to show that despite Allen allowing West essentially interest-free credit to build his own home, and in allowing West to build his son a home for a discounted rate, West did not pay back the more than $100,000.00 he owed to GABI and/or Allen. In fact, when asked by Allen whether he had paid the more than $50,000.00 balance on his home, West falsely replied that he had, when he had not. West even exceeded the budget which had been authorized, causing additional expense and damage to GABI.

[24] The jury heard evidence that West consistently and severely under-reported the amounts owed by GABI. As of West's resignation from GABI and Princeton, subcontractors and suppliers were owed approximately $2.4 million by GABI, of which debt Allen personally paid approximately $803,000.00. West specifically had instructed Hutchinson to not inform Allen that GABI was operating at a substantial loss and had substantial unpaid bills.

[25] Finally, the jury heard evidence that West failed to fulfill his duties as president by allowing GABI to breach its contracts. For example, although contractually-bound to provide a deed and title insurance to the Fujiharas for their newly-built home, West participated in the closing and allowed it to proceed without

the deed, title insurance, or land having been procured. Further, West allowed closing to proceed without having fully paid all subcontractors and suppliers, leaving GABI to make up the shortfall. This evidence provides ample support for the jury's finding that West breached his duty to deal fairly, honestly, and openly with GABI. The jury's verdict that West breached his fiduciary duty to GABI is supported by more than sufficient evidence.

## II. Whether Sufficient Evidence Supports the Jury's Award of $220,000.00 to GABI

[26] West also challenges the sufficiency of the evidence to sustain the jury's award of $220,000.00 to GABI.

> We apply a "strict standard" when we review an appellate claim that a jury's damages award was excessive. *Id*. "A jury's determination of damages is entitled to great deference when challenged on appeal." *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001).
>
> > Damages are particularly a jury determination. Appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead, the court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed.
>
> *Id*. (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *reh'g denied, trans. denied*). When considering a claim of an excessive jury verdict, we [do not] reweigh the evidence, and we "look only to the evidence and the reasonable inferences

therefrom which uphold the verdict." *Lutheran Hosp. of Indiana, Inc. v. Blaser*, 634 N.E.2d 864, 873 (Ind. Ct. App. 1994), *reh'g denied*. "To warrant reversal, the award 'must appear to be so outrageous as to impress the Court at "first blush" with its enormity.'" *Ritter*, 745 N.E.2d at 844 (quoting *Kimberlin v. DeLong*, 637 N.E.2d 121, 129 (Ind. 1994) (quoting *New York Cent. R.R. Co. v. Johnson*, 234 Ind. 457, 127 N.E.2d 603 (1955)), *reh'g denied, cert. denied*).

*Reed v. Bethel*, 2 N.E.3d 98, 113–14 (Ind. Ct. App. 2014).

[27]     We also have little trouble concluding that the jury's award of damages is amply supported by the record. At the very least, the jury heard evidence that West was breaching his fiduciary duties from 2008 to 2010, a period for which he received approximately $339,000.00 in compensation. Because an appropriate remedy for breach of fiduciary duty can include return of compensation for the period of breach, the return of West's compensation supports the jury's award by itself. *See SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011) ("The remedy for the breach of a fiduciary duty is requiring the agent to disgorge all compensation received during the period of employment in which the agent was also breaching his fiduciary duty.").

[28]     In any event, the jury also heard evidence that West directed as much as $90,000.00 in unauthorized payments to himself and others from GABI funds. The record contains evidence that GABI owed subcontractors and suppliers $2.4 million when West left GABI, a situation caused by West providing false accounts-payable reports. It is reasonable to conclude that at least some of this

debt would not have been incurred without West's breach of his fiduciary duty. The jury heard evidence that West owed approximately $300,000.00 to GABI, only some of which was paid back. Although we do not have a detailed accounting of the jury's calculations, we conclude that the award of $220,000.00 to GABI is amply supported by the record.

### *Cross-Appeal Issues*

## III. Whether Sufficient Evidence Supports the Jury's Verdict Against Cross-Appellants for Defamation

[29] A defamatory communication is one that "tend[s] to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992), *trans. denied*. "Whether [a communication] is defamatory 'depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place.'" *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 451 n.6 (Ind. 1999) (citations omitted). In order to maintain an action for defamation, the plaintiff must demonstrate (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Id*. "Whether a communication is defamatory or not is a question of law for the court, unless the communication is susceptible to either a defamatory or nondefamatory interpretation—in which case the matter may be submitted to the jury." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007) (citation omitted).

[30] West's defamation counterclaim against Cross-Appellants was based entirely upon the Letter, which Allen wrote and sent through GABI and Princeton on January 18, 2011 to customers, subcontractors, and suppliers in Marion and Johnson Counties. The Letter contains the following allegation, which the parties seem to agree is the most serious against West:

> After [West's and Hutchinson's] departure[s], I learned that both homebuilding companies they managed were in substantial arrears to several of their suppliers and subcontractors…. We discovered through a recent and on-going audit that [West and Hutchinson] collectively made over 100 unauthorized withdrawals from company funds which total in excess of One Million Dollars. Most of these unauthorized withdrawals were check payments posted in the accounting system as if those check payments were being made to suppliers or subcontractors when in fact the corresponding checks were being written by [Hutchinson] to herself and [West].

Plaintiff's Exs. 68, 69. West's counterclaim alleged, *inter alia*, that Cross-Appellants published the Letter "with the intent to charge West with the offense of embezzlement and/or theft of money." Appellee's App. p. 19.

[31] Cross-Appellants contend that the jury's verdict against them for defamation cannot stand because the jury's verdict on the breach of fiduciary duty and theft claims conclusively establish that the statements in the Letter are true. Article I, section 10, of the Indiana Constitution provides that "[i]n all prosecutions for libel, the truth of the matters alleged to be libellous, may be given in justification." We have recognized that

as a general proposition, proof of the truth of an alleged defamation has been held to be a complete defense to a civil action for libel. *Palmer v. Adams*, (1894) 137 Ind. 72, 36 N.E. 695, citing Ind. Const., art. 1, s 10. See also 18 I.L.E. Libel and Slander s 62 (1959). We also observe, however, that whenever the question arises, the defamer bears the burden of proof on this issue of fact, since 'truth' is an affirmative defense to a claim for libel. *Weenig v. Wood*, [169 Ind. App. 413, 440, 349 N.E.2d 235, 251 (1976)]. Moreover, when an alleged defamer … appeals a negative judgment on the issue of truth, a Court on appeal may hold in his favor only if it determines no reasonable trier of fact could have decided his accusations were untrue. *Id*.

*Elliott v. Roach*, 409 N.E.2d 661, 681 (Ind. Ct. App. 1980) (footnote omitted).

[32] Cross-Appellants' argument is, essentially, that the jury rendered inconsistent verdicts that must be reconciled.[2] Specifically, Cross-Appellants point to the jury's verdicts of breach of fiduciary duty and theft in favor of GABI and against West as proof that the allegations in the Letter are all "true." "The Law indulges every reasonable presumption in favor of the legality of jury verdicts, and corrective action should only be taken when the verdict or verdicts are 'inconsistent because [of] a logical or legal impossibility.'" *Tincher v. Davidson*,

---

[2] Cross-Appellants do not argue that West's defamation claim must fail because he failed to show malice, even though they argue in the next section that the award of punitive damages against Allen must be reversed for that reason. This is, perhaps, because the allegations against West seem to clearly qualify as libel *per se*. As Judge Faulconer of this court explained, the law presumes damages in cases of defamation *per se*, which includes "[w]ords in the form of libel which, on their face, without resort to extrinsic facts or circumstances, that is to say, *'per se,'* tend to degrade another person, impeach his honesty, integrity, or reputation, or bring him into contempt, hatred, ridicule, or causes him to be shunned or avoided." *Gibson v. Kincaid*, 140 Ind. App. 186, 201, 221 N.E.2d 834, 843 (1966) (Faulconer, J., concurring in result). While a communication that contains libel *per se* would seem to relive a plaintiff of the burden of proving malice, it does not necessarily follow that malice is automatically presumed for purposes of punitive damages in such a case. In any event, we address Cross-Appellants' arguments as stated.

762 N.E.2d 1221, 1226 (Ind. 2002) (quoting *Indpls. Newspapers, Inc. v. Fields*, 259 N.E.2d 651, 668 (Ind. 1970)).[3]

[33] The most damning accusation against West in the Letter is that he and Hutchinson collectively made over 100 unauthorized withdrawals of over one million dollars disguised as payments to suppliers or subcontractors. The only fair reading of this is that Cross-Appellants were essentially accusing West (and Hutchinson) of stealing over one million dollars from GABI and Princeton. Cross-Appellants' argument that the jury's verdicts are fatally inconsistent must fail, however. The jury found that West's breach of fiduciary duty caused GABI $220,000.00 in damages, which is far less than the over one million dollars that he was alleged to have stolen. Similarly, the jury found that West's theft from GABI was $4000.00, again falling far short of rendering the accusation against him "true," even if added to the damages for breach of fiduciary duty. Put another way, the jury could have found that West "stole" $224,000.00 from GABI but that Cross-Appellants defamed him by alleging that he stole far more. Because the jury's verdicts are not inconsistent based on logical or legal impossibility, Cross-Appellants have failed to establish that the jury's verdict that they defamed West must be overturned on that basis.

---

[3] This proposition is still good law in a civil context. We note, however, that in a somewhat recent criminal case, the Indiana Supreme Court held that "inconsistent jury verdicts are not subject to appellate review[.]" *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010).

# IV.  Whether Sufficient Evidence Supports the Jury's Award of Punitive Damages to West from Allen for Defamation

[34]   The jury awarded $50,000.00 in presumed damages to West for Allen's defamation and $300,000.00 in punitive damages, later reduced to $150,000.00. The standard for review of a verdict on an award of punitive damages is whether a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppressiveness that was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.  *Budget Car Sales v. Stott*, 662 N.E.2d 638, 639 (Ind. 1996).  Punitive damages are awarded upon a showing of intentional conduct which focuses on the defendant's state of mind. *Peterson v. Culver Educ. Found.*, 402 N.E.2d 448, 458 (Ind. Ct. App. 1980).

[35]   Allen contends that the record contains insufficient evidence to sustain the jury's finding that he acted with actual malice[4] in publishing the Letter.

> Actual malice must be shown by clear and convincing evidence. Actual malice exists when the defendant publishes a defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not.  Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  To demonstrate reckless disregard, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained

---

[4]  West argues only that the jury properly found actual malice on Allen's part and does not allege that the record would support findings of fraud, gross negligence, or oppressiveness.

serious doubts as to the truth of his publication or proof that the false publication was made with a high degree of awareness of their probable falsity. Hence, a defendant's actual state of mind is a critical factor in the analysis. A defendant's state of mind is a subjective fact and may be shown by indirect or circumstantial evidence.

The question of whether there is sufficient evidence to support a finding of actual malice is a question of law to be determined by the court. This rule is premised on two important considerations: (1) the national commitment to the free exchange of ideas, as enshrined in the First Amendment and (2) the recognition that judges as expositors of the Constitution have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice. We [have already] discussed … the need to conduct an examination of the factual record in full. In an independent review, each piece of evidence may be considered cumulatively.

*Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 456 (Ind. 1999) (citations and quotation marks omitted).

[36] We conclude that there is insufficient evidence to sustain a finding, by clear and convincing evidence, that Allen had actual malice when defaming West. The only evidence West points to relates to a June 30, 2010, encounter between Allen and Hutchinson, during which Hutchinson signed the Statement, which indicated that she had acted under West's direction. *See* Defendant's Ex. K. West first argues that Hutchinson's testimony that she believed the Statement to contain falsehoods is evidence of Allen's actual malice. Hutchinson's belief that the statement was false—even if this is true—has nothing to do with whether *Allen* believed it to be false, and so does not support a finding of actual

malice. West also points to Hutchinson's testimony that Allen hugged her after she signed the Statement and told her, "I'm not going to do anything to you, this is all about [West], I'm going to get [West,]" and claims that this is clear proof of Allen's malicious intent. We conclude that this testimony is no more probative of actual malice than Hutchinson's uncommunicated beliefs regarding the falsity of the Statement. Allen's stated desire to "get" West in no way indicates a belief that the Statement was false or that Allen harbored a reckless disregard for its truth. On the whole, Allen's behavior during the meeting with Hutchinson (and throughout the rest of the case) was entirely consistent with a firm belief that the allegations against West were true, leaving no impression of a belief that they were false. Because we conclude that there is insufficient evidence to sustain the jury's finding that Allen acted with actual malice, we reverse its award of punitive damages to West.[5]

# Conclusion

[37] We conclude that sufficient evidence supports (1) the jury's finding that West breached his fiduciary duty to GABI, (2) the jury's award to GABI of $220,000.00 for West's breach of his fiduciary duty, and (3) the jury's finding that Cross-Appellants defamed West in the Letter. We also conclude, however,

---

[5] Because we conclude that the jury's award of punitive damages was unsupported by sufficient evidence, we need not reach Allen's argument that presumed damages do not qualify as compensatory damages for purposes calculating the maximum award of punitive damages.

that the jury's award of $150,000.00 in punitive damages to West based on Allen's defamation is not supported by sufficient evidence.

[38]   We affirm the judgment of the trial court in part and reverse in part.

Robb, J., and Crone, J., concur.