FILED

Aug 20 2018, 8:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Brian J. Paul
Harmony A. Mappes
Jason M. Rauch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Ronald S. Todd
Noblesville, Indiana

ATTORNEYS FOR AMICUS
CURIAE INDIANA TRIAL
LAWYERS ASSOCIATION

Thomas C. Doehrman
Daniel J. Buba
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Levetta Tunstall, <br> *Appellant-Defendant,* <br><br> v. <br><br> Dawn Manning, <br> *Appellee-Plaintiff* | August 20, 2018 <br><br> Court of Appeals Case No. <br> 49A04-1711-CT-2572 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable James B. Osborn, Judge <br><br> Trial Court Cause No. <br> 49D14-1602-CT-7366 |

**Altice, Judge.**

## Case Summary

[1] In 2014, Dawn Manning and Levetta Tunstall were involved in a minor vehicle collision. Tunstall admitted fault and the parties litigated the issue of damages at a three-day jury trial in 2017. The jury awarded Manning $1.3 million for her pain and suffering resulting from on-going neck and back pain caused by the accident. Tunstall now appeals, arguing that she is entitled to a new trial for four reasons: (1) the verdict is excessive; (2) the trial court abused its discretion by refusing to allow Tunstall to cross-examine Manning's expert witness about his disciplinary history with the Medical Licensing Board; (3) the trial court committed fundamental error by discharging a juror during deliberations without creating the appropriate record; and, (4) jury deliberations were improperly tainted by the comments of a juror.

[2] We affirm.[1]

## Facts & Procedural History

[3] On the afternoon of October 24, 2014, Manning – age thirty-one – was stopped at a stop sign preparing to turn right out of her apartment complex onto Georgetown Road in Indianapolis. Tunstall approached from behind, did not realize that Manning was still at the intersection, and hit her brakes and swerved just before colliding with Manning's vehicle. The right front of Tunstall's vehicle struck the left corner of Manning's rear bumper, pushing Manning's vehicle into Georgetown Road. Fortunately, no on-coming traffic

---

[1] We held oral argument in Indianapolis on July 10, 2018.

was present. The low-speed collision caused damage to Manning's bumper and misalignment of Tunstall's vehicle. After moving her vehicle out of traffic, Manning called 911 and her mother.

[4] Manning began experiencing a headache and neck pain at the scene. She refused an ambulance but had her boyfriend drive her to the emergency room that same day. The emergency room physician treated Manning for whiplash, prescribing pain medicine and a muscle relaxant. When the pain did not subside over the next couple days, Manning returned to the emergency room and was told to seek chiropractic treatment. On November 14, 2014, she went to a chiropractor, complaining of bilateral posterior neck pain that radiated to her head and shoulders, headaches, and mid-back pain. After months of bi-weekly treatments, Manning experienced little relief from her pain.

[5] In June 2015, Manning saw another doctor for her on-going neck and back pain. X-rays taken of her cervical and thoracic spine were normal. The doctor prescribed pain medication and a muscle relaxant and referred her to a spine specialist, Dr. Rick Sasso of the Indiana Spine Group. Manning was treated at Dr. Sasso's office in July 2015. The impressions contained in the medical record of that visit indicate that Manning was suffering from significant cervical sprain, as well as an upper thoracic sprain. Dr. Sasso ordered an MRI, which returned unremarkable. Dr. Sasso recommended that Manning's pain be managed with injections, but Manning was unwilling – at least at that point – to start regular injections that would potentially last the rest of her life. Dr. Sasso also recommended physical therapy and prescribed a muscle relaxant.

[6] On September 22, 2015, Manning met with Dr. Steven Paschall – the medical expert she later retained for trial[2] – for an independent medical examination. Manning complained of a constant ache in her neck, multiple daily neck spasms, and mid-back pain. Dr. Paschall inquired about the effects that her condition had on her activities of daily living. After a physical examination, which demonstrated a limited range of motion in her cervical spine, Dr. Paschall took several x-rays, including x-rays in flexion and in extension.[3] The x-rays in flexion demonstrated "a significant angular motion segment integrity change at C4/5" with a loss of motion integrity of over twenty degrees. *Id*. Based on his independent examination of Manning, Dr. Paschall diagnosed her with "cervical spine ligament laxity, with alteration of motion segment integrity; thoracic strain, and limited cervical range of motion." *Id*. at 11. Dr. Paschall opined that Manning had reached maximum medical improvement and suffered from a permanent injury/chronic pain as a result of the collision. He gave her a permanent partial impairment rating of twenty-eight percent.

[7] Manning filed her complaint for damages on February 29, 2016. At the three-day trial in August 2017, in addition to Dr. Paschall's video deposition, Manning presented the testimony of her mother and father, her best friend, her

---

[2] Dr. Paschall is board certified in emergency medicine, which he practiced for about thirty years before retiring in 2012. Upon his retirement, he started a business called Medical Legal Consultants of Indiana.

[3] "These are the types of x-rays that one obtains if one suspects someone has some type of motion segment integrity violation in their neck, which is commonly found in patients that have cervical ligament or muscle injury." *Transcript Vol. III* at 10. Manning's previous doctors had not performed x-rays in flexion and in extension.

boyfriend, and herself to establish the effect her chronic pain has had on her life since the accident. The pain limits her ability to stand or sit for extended periods of time, lift objects overhead or off the floor, wear heels, and participate fully in activities that she previously enjoyed, such as dancing, shopping, taking long walks, traveling, and high-adventure activities. Manning has become isolated and unable to enjoy her once-active lifestyle. Since the accident, she has become moody, depressed, and not her vivacious, outgoing self. Particularly devastating to Manning, she has been unable to continue her previously-active modeling career, and has gained a significant amount of weight due to her inability to work out and her mood. Although she has been able to continue working in her father's seasonal tax business and as a real estate agent, her pain has limited the number of hours she can work. Manning's long-term boyfriend emphasized that even three years after the accident, her quality of life was still negatively affected. He also noted the drastic change to their intimate relations since the accident, which has had an effect on their relationship.

[8] Tunstall presented opposing expert testimony. Ana Barbir, a forensic biochemical engineer, testified that Manning's alleged long-term injuries were not "consistent…with what's known for biomechanical tests." *Id*. at 175. Manning subjected Barbir to vigorous cross-examination. Dr. David Steinman, a neurosurgeon specializing in the cervical and lumbar spine, testified regarding his own independent medical examination of Manning and his review of her

past medical records. In Dr. Steinman's opinion, Manning had no permanent injuries and was a malingerer.

[9] As set forth above, the jury returned a verdict in favor of Manning in the amount of $1.3 million. Tunstall filed a motion to correct error, arguing that the verdict was excessive and alleging juror misconduct. The trial court held a hearing on the motion to correct error on October 25, 2017, and then took the motion under advisement. On November 2, 2017, the trial court issued an order summarily denying the motion to correct error. Tunstall now appeals. Additional facts will be provided below as needed.

## Discussion & Decision

### 1. Excessive Verdict

[10] In considering whether a jury verdict is excessive, we do not reweigh the evidence and look only to the evidence and reasonable inferences that may be drawn therefrom that support the verdict. *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017), *trans. denied*. "If there is any evidence to support the amount of the award, even if it is conflicting, this court will not reverse." *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind. Ct. App. 2001), *trans. denied*. To warrant reversal, "the award must appear to be so outrageous as to impress the Court at first blush with its enormity." *Id.* at 644 (internal quotation marks omitted). Where the award is so outrageous that it indicates the jury was motivated by passion, prejudice, partiality, or the consideration of improper evidence, we will find the award excessive. *Groves v. First Nat'l Bank of*

*Valparaiso*, 518 N.E.2d 819, 831 (Ind. Ct. App. 1988), *trans. denied*. We will uphold a verdict if it "can be explained on any reasonable ground." *Berman v. Cannon*, 878 N.E.2d 836, 840 (Ind. Ct. App. 2007), *trans. denied*.

[11]  "[A]wards for pain, suffering, fright, humiliation, and mental anguish are particularly within the province of the jury because they involve the weighing of evidence and credibility of witnesses." *Ritter*, 745 N.E.2d at 845. Because physical and mental pain are not readily susceptible to quantification and cannot be calculated with mathematical certainty, the jury is given "very wide latitude" in determining such damages. *Id*. "Our inability to look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence." *Id*.

[12]  Tunstall argues that the $1.3 million verdict in this case is excessive and urges us to engage in a comparative analysis of jury verdicts in other cases involving "a very common type of accident (a fender-bender) with very common alleged injuries (neck and back pain)." *Appellant's Brief* at 29. For the reasons thoroughly addressed in *Ritter*, we reject this approach. *See Ritter*, 745 N.E.2d at 845-49. "The nature and extent of pain and suffering are seldom, if ever, alike in any two cases." *Id*. at 849.

[13]  Here, the evidence favorable to the verdict reveals that although the collision in question was relatively minor, it resulted in painful injury to Manning and left her with a twenty-eight percent whole person permanent impairment.

Manning, a young woman, now has chronic neck/back pain and neck spasms that limit her daily activities and have substantially affected her life. Before the accident, she was a successful model with several agencies and was extremely fit, working out at the gym on a near daily basis. She was extroverted, full of life, and had "energy…through the roof". *Transcript Vol. II* at 221. She enjoyed being active, traveling, all-day shopping trips, long walks, dancing, and adventure. All this changed, when at the age of thirty-one, she was struck from behind by Tunstall. In the months after the accident, Manning suffered headaches and significant neck/back pain, which caused her to stay in bed and become despondent. She pursued various treatments and took prescribed medication, but she experienced little relief. She learned to limit her daily activities and made other changes to her life in attempts to reduce the pain and frequent neck spasms. Manning could no longer model or workout. She experienced significant weight gain, changes in her mood, and bouts of depression and anxiety. Her intimate relationship with her long-term boyfriend has also suffered. Years after the accident, Manning continues to live with pain, has substantial, daily limitations on regular life activities, and in many ways, cannot live the life she enjoyed before the accident.

[14] Although the jury might have assessed higher damages than we would have, we are unpersuaded that the $1.3 million verdict in this case is great enough to be characterized as excessive. In other words, we cannot say as a matter of law that Manning's pain and suffering since the accident and into the future is

worth less than the jury's award. The verdict fell within the bounds of the evidence, and Tunstall's attempt to have us reweigh the evidence is improper.

## 2. Dr. Paschall's Disciplinary History

Tunstall argues that the trial court abused its discretion by refusing to admit evidence regarding Dr. Paschall's disciplinary history with the Indiana Medical Licensing Board (the Board). On appeal, Tunstall expressly does not argue that the reasons for past discipline were admissible; she argues only that the fact Dr. Paschall had been disciplined in the past was admissible.

A trial court's determination regarding the admissibility of evidence is afforded great discretion. *Linton v. Davis*, 887 N.E.2d 960, 965 (Ind. Ct. App. 2008), *trans. denied*. We will find an abuse of discretion where the trial court's ruling is against the logic and effect of the facts and circumstances before the trial court or the court misinterpreted the law. *Id.* Moreover, evidentiary error requires reversal only if it is inconsistent with substantial justice. *Id.* In determining whether to reverse, we assess the probable impact on the jury. *Id.*

The record establishes that throughout his more than 30-year medical career, Dr. Paschall has been disciplined by the Board twice. In November 2009, Dr. Paschall entered into a stipulated agreement with the Board pursuant to which he was fined $500. In January 2016, he was fined $1000 and his license was placed on indefinite probation for a minimum of 1 year with certain terms and conditions. By the time of the instant trial in August 2017, Dr. Paschall's license was back in good standing.

[18] In *Linton*, this court held that "the licensure status of a physician who gives an expert opinion is admissible to impeach the doctor's opinion." *Id.* at 969. Thus, the *Linton* court affirmed the trial court's admission of evidence that the medical-malpractice defendant, who testified as an expert regarding his compliance with the standard of care, was currently on indefinite probation. *Id.* at 967-69. Only the final action taken by the Board, however, was admissible. *Id.* at 969.

[19] Unlike in *Linton*, Dr. Paschall was in good standing (i.e., not on probation) at the time he testified in this case. Tunstall argues that this is a distinction without a difference. We are not so sure. Clearly, an expert's past disciplinary history is, if at all, not as relevant as the expert's current probationary status.

[20] Further, we do not believe that admission of the following deposition testimony would have had any significant impact on the jury:

> [Tunstall's Counsel:] Okay. So during the course of your – your medical career, has your license ever been on probation, revoked, suspended?
>
> [Dr. Paschall:] Yes, ma'am.

*Appellee's Appendix Vol. 2* at 2.[4] The trial court's redaction of this portion of the deposition, if erroneous, was harmless at best.

---

[4] During the deposition, rather than address the timing of Dr. Paschall's one instance of probation, defense counsel attempted to ask a series of questions exploring the reasons for the discipline. Dr. Paschall refused to answer these questions. Tunstall openly acknowledges on appeal that testimony regarding the reasons for the discipline would not have been admissible at trial. Despite this, the dissent references the last-minute motion

### 3. Discharge of Juror

Less than an hour and one-half into deliberations, regular juror Mary Staton sent a note to the trial court. Staton indicated, "I don't feel as we are close to a decision. I need to leave to pick up my grandson. Can I be excused?" *Transcript Vol. IV* at 146. After discussing the matter with counsel, the court refused the request and directed the jury to continue deliberating.

Over an hour later, the jury sent the court a note that said, "Your Honor, the jury cannot reach a verdict at this point due to the award amount. We find for the plaintiff, but can't agree on the award. We are one million dollars apart with one juror unable, or unwilling to budge." *Id*. at 148. Again, the court addressed the note with counsel and then instructed the jury to continue deliberating.

Forty-nine minutes later, the court received another note from juror Staton, who wrote, "I would like to be excused due to pain in my legs. Can the

---

to compel that Tunstall filed on the eve of trial and eleven days after the deposition. In the motion, which was denied, Tunstall asked the trial court to compel Dr. Paschall to answer the unanswered questions from the deposition, as well as reasonable follow-up. Tunstall did not submit additional questions for the witness or request another deposition. A review of the unanswered questions reveals that the answers *to these questions* would not have been admissible, and the questions themselves were permeated with inadmissible references to criminal convictions.

Additionally, we find the dissent's reliance on *Sneed v. Stovall*, 22 S.W.3d 277 (Tenn. Ct. App. 1999) to be curious. In *Sneed*, the restrictions on the expert witness's medical license were still in place at the time of trial – he was just over three years into his five-year term of probation. *See id*. at 278. Moreover, during the deposition, the witness was asked about the status of his medical license and whether he had been subject to any disciplinary proceedings. Unlike in the case at hand, the witness in *Sneed* untruthfully responded that he had not. *See id*. at 281 (defendants sought to impeach expert's credibility "because of his untruthful answers under oath concerning prior disciplinary proceedings, and they [sought] to show his current status as a practicing physician").

alternate take over in my absence? I hate to ask but I'm in pain and can't take it any longer." *Id*. at 149-50. Once again, the court spoke with counsel. Manning's counsel stated that he did not have a problem with granting the juror's request. Tunstall's counsel then expressly indicated that she had no objection to the request either. The court brought the jury back into the courtroom, along with counsel (Tunstall's counsel on the phone) and stated:

> I've received a note from Ms. Staton indicating that she's having some problems, and I've discussed your request with the parties, and I think there's an agreement that you can be released from your service, uh, based upon your having pain and experiencing it, and not being able to take it any longer. So, Ms. Staton you will be excused from the jury, and that means, Mr. Hill, you are now a juror as opposed to an alternate juror, and you could participate in the deliberations….

*Id*. at 50-51. The jury deliberated for about forty more minutes and then issued its $1.3 million verdict.

[24] Tunstall argues that the trial court committed fundamental error by discharging Staton without creating the appropriate record. Relying on *Riggs v. State*, she notes that once deliberations have begun, "the discharge of a juror is warranted only in the most extreme situations where it can be shown that the removal of the juror is necessary for the integrity of the process, does not prejudice the deliberations of the rest of the panel, and does not impair the parties [sic] right to a trial by jury." 809 N.E.2d 322, 327-28 (Ind. 2004). *Riggs* requires a "carefully developed record as to the grounds for removal and also requires precautions to avoid inappropriate consequences from the removal." *Id*. at 327.

[25]    There are several important differences between *Riggs* and this case. Staton – not the trial court – requested that the alternate replace her. Thus, the trial court did not remove a willing juror. Further, unlike in *Riggs*, Staton's replacement was not based on her being "a dissenting juror" or due to any misconduct.[5] *Id*. at 327. Staton was dismissed because she was experiencing pain in her legs during deliberations, and the trial court informed the remaining jurors that this was the reason for her removal. The most notable distinction is that Tunstall affirmatively agreed to the removal of Staton, while in *Riggs,* the defendant vehemently and repeatedly objected.

[26]    We assume, arguendo, that the trial court's failure to fully comply with the developed-record requirements set forth in *Riggs* amounted to structural error. *See Durden v. State*, 99 N.E.3d 645, 654 (Ind. 2018). The record, nevertheless, establishes that Tunstall invited the error when her counsel affirmatively agreed to the removal of Staton. *See id*. at 655-56 (invited-error doctrine precluded a remedy for the defendant's claim of structural error); *see also Brewington v. State*, 7 N.E.3d 946, 975 (Ind. 2014) ("fundamental error gives us leeway to mitigate the consequences of counsel's oversights, but invited error precludes relief from counsel's strategic decisions gone awry"). Tunstall's counsel was in the best position to observe Staton throughout trial and to make a reasoned decision

---

[5] In *Riggs*, "the actions leading to the dismissal arose from the deliberations." *Id*. at 328. Our Supreme Court found dismissal unwarranted in that case, explaining: "Removal of a juror for misconduct requires more than a refusal to negotiate further. If there were a showing of physical confrontation, or attempts to intimidate other jurors, then removal may be permissible. But this record does not establish these extreme modes of conduct." *Id*. (internal citation omitted).

whether to keep her on the jury. Further, counsel knew that one juror – possibly Staton – was $1 million away from the verdict proposed by the rest of the jury. Based on the record, we conclude that Tunstall engaged in a rational, albeit unsuccessful, trial strategy. She cannot now be heard to complain.

### 4. Juror Misconduct

[27] Finally, Tunstall argues that she is entitled to a new trial due to juror misconduct. She directs our attention to an affidavit made by Staton (and prepared by Tunstall's counsel) just shy of a month after the trial. Staton sought out defense counsel after learning of the verdict and expressed her disagreement with the amount of the verdict. According to Staton's affidavit, a juror named Michelle shared during deliberations that she had been treated by Dr. Sasso, one of Manning's physicians, for similar back injuries. Based on her own experience with that doctor, Michelle maintained that the doctor would not have "ordered the MRI or prescribed injections unless he saw something." *Appellant's Appendix Vol. 2* at 81. The trial court denied Tunstall's motion to correct error in which she alleged juror misconduct.

[28] A trial court's ruling with respect to a motion to correct error carries a strong presumption of correctness and will be reversed only for an abuse of discretion. *S. Bend Clinic, Inc. v. Kistner*, 769 N.E.2d 591, 592 (Ind. Ct. App. 2002). A defendant who seeks a new trial based on alleged juror misconduct generally must demonstrate that the conduct was gross and that it probably harmed the defendant. *Id*. For juror misconduct cases not involving out-of-court

communications with unauthorized persons, prejudice must be affirmatively demonstrated; it will not be presumed. *Id.*; *see also Ramirez v. State*, 7 N.E.3d 933, 938 (Ind. 2014) ("the 'probable harm' standard [is] reserved for juror misconduct cases not involving out-of-court communications with unauthorized persons—that is, that the misconduct is "gross" and "probably harmed the defendant"").

[29] Although a verdict may not normally be impeached by juror testimony, an exception exists where "extraneous prejudicial information was improperly brought to the jury's attention". Ind. Evidence Rule 606(2)(B); *see also Kistner*, 769 N.E.2d at 593 ("exception to this general rule occurs when there is evidence demonstrating that the jury was exposed to improper, extrinsic material during its deliberations, and when a substantial possibility exists that the verdict was prejudiced by the improper material").

[30] Tunstall acknowledges that jurors are allowed, and even encouraged and instructed, to bring their common sense, knowledge, and general personal experience to deliberations.[6] But she argues that the statements made by Michelle, as well as Michelle's personal opinions, go "beyond the kind of general knowledge that a juror might appropriately bring to deliberations; it is specific knowledge about a specific person involved in this specific case. This

---

[6] In this case, the jury was specifically instructed by the trial court: "In deciding what or whom you believe, you should use your own knowledge, experience, common sense – and common sense gained from day-to-day living." *Transcript Vol. II* at 74.

infiltration of outside information and bias provides an independent basis for granting a new trial." *Appellant's Brief* at 48.

[31] We conclude that Staton's affidavit does not amount to evidence warranting a new trial.[7] Michelle's statements were based on her own knowledge and common sense. *See Naumoski v. Bernacet*, 799 N.E.2d 58, 63 (Ind. Ct. App. 2003) ("We no longer expect or wish for our jurors to ignore the knowledge with which they enter the courtroom."), *trans. denied*. That is, she had been treated by Dr. Sasso in the past and her experience and common sense indicated that Dr. Sasso would not order an MRI and spinal injections if his patient was entirely healthy. Further, Dr. Sasso was not a testifying witness, and his credibility was not at issue. In fact, Tunstall's own medical expert relied on the records and MRI from Dr. Sasso's treatment of Manning.

[32] In sum, we cannot say that there was a substantial possibility that Michelle's statements prejudiced the verdict. *See Stephenson v. State,* 742 N.E.2d 463, 477 (Ind. 2001) ("extrinsic or extraneous material brought into deliberation may be grounds for impeaching a verdict where there is a substantial possibility that such extrinsic material prejudiced the verdict"). Nor do we believe that her statements constituted gross misconduct. *See Naumoski*, 799 N.E.2d at 63 (we instruct jurors to use the knowledge with which they enter the courtroom, so "it

---

[7] We note that the trial court impliedly questioned Staton's credibility. At the hearing on the motion to correct error, the court noted that Staton "didn't have the courage to stay in that room and fight for her beliefs and wanted out" and then returned after the verdict to try to "nullify" it. *Transcript Vol. IV* at 170.

cannot be gross misconduct to do precisely what the court instructed the jurors to do"). Accordingly, the trial court did not abuse its discretion in refusing to grant a new trial on this ground.

[33] Judgment affirmed.

[34] Kirsch, J., concurs.

[35] Baker, J., dissents with opinion.

| | |
|---|---|
| Levetta Tunstall, <br> *Appellant-Defendant,* <br><br> v. <br><br> Dawn Manning, <br> *Appellee-Plaintiff* | Court of Appeals Case No. <br> 49A04-1711-CT-2572 |

**Baker, Judge, dissenting.**

I respectfully dissent because I disagree with the majority's conclusion regarding Dr. Paschall's testimony.

In *Linton*, this Court squarely held that "the licensure status of a physician who gives an expert opinion is admissible to impeach the doctor's opinion." *Id.* at 969. Here, the trial court implicitly distinguished this case from *Linton* by finding that because Dr. Paschall's license was in good standing at the time of trial, his disciplinary history was irrelevant and inadmissible.

[3]   I agree with Tunstall that this is a distinction without a difference. Although there is little Indiana caselaw on the issue, I find *Sneed v. Stovall*, 22 S.W.3d 277 (Tenn. Ct. App. 1999), instructive. In that case, Sneed asserted that the trial court erroneously permitted Stovall to present proof of Sneed's medical expert's past conduct. The *Sneed* Court disagreed:

> Certainly, the truthfulness of the witness will be a matter of grave concern for the jury . . . . [The expert] was bound by the ethical rules of his profession, and yet engaged in a practice of deception for a number of years even though he knew that his acts could constitute grounds for revocation of his license. His veracity as a witness should surely be questioned by virtue of this conduct.
>
> ***
>
> In short, the jury must determine whether [the expert's] testimony . . . is truthful and in giving weight to his testimony, the jury should have the benefit of evidence concerning his veracity and character.

*Id.* at 282. Ultimately, the court found that evidence regarding the expert's past disciplinary history—not just his licensure status at the time of trial—was admissible. *Id.*

[4]   In this case, the Medical Licensing Board found that in the past, Dr. Paschall committed "fraud or material deception in order to obtain a license to practice." Appellant's App. Vol. II p. 43. At the time he examined Manning, he was facing another disciplinary complaint, which ultimately resulted in the indefinite probation of his medical license for a minimum of one year. I agree

with Tunstall that she was entitled to ask about the status of his license when she examined Manning, "if not before and after then, and the jury was entitled to hear his answers and use them to evaluate the credibility of his opinions." Appellant's Br. p. 37. Precluding that line of questioning effectively precluded her from attacking his credibility, which is neither in line with *Linton*, nor, in my opinion, with the principle of fairness. Therefore, I believe the exclusion of this evidence was erroneous.

[5] I part ways with my colleagues' conclusion that, even if the exclusion was erroneous, it was harmless error. Dr. Paschall was the *only* medical expert presented by Manning, and his testimony squarely and profoundly disagreed with the multitude of experts presented by Tunstall. Even though Tunstall concedes that the specific acts underlying his disciplinary history would not be admissible, the mere fact that the Medical Licensing Board found that he had behaved in fraudulent or deceptive ways in the past would be material to the jury's evaluation of his testimony. That, in turn, would have the potential to affect the ultimate verdict, inasmuch as he was Manning's only medical expert.

[6] I note that the only deposition testimony referred to by the majority was Dr. Paschall's affirmative response to the question of whether his license had ever been on probation, revoked, or suspended. Slip op. p. 10. Tunstall's attorney attempted to ask a series of follow-up questions at the deposition, which Dr. Paschall repeatedly refused to answer. After a series of refusals, Tunstall's attorney concluded the deposition without further pursuing the line of questioning because it would have been futile to continue. Counsel indicated a

plan to file a motion to compel the doctor's response to questions regarding his disciplinary history. I believe that the trial court should have granted said motion to compel, meaning that there would have been more testimony regarding his disciplinary history for the jury to have considered.

In sum, I believe that the exclusion of this line of questioning was both erroneous and not harmless. Therefore, I would reverse on this basis and remand for a new trial.